In the

# United States Court of Appeals

## For the Seventh Circuit

No. 07-3566

MAZENAH DUAD,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

On Petition for Review of a Final Order of the
Board of Immigration Appeals.
No. A 29 483 550

ARGUED SEPTEMBER 9, 2008—DECIDED FEBRUARY 12, 2009

Before BAUER, CUDAHY, and WOOD, *Circuit Judges*.

WOOD, *Circuit Judge.* Mazenah Duad is a 65-year-old native and citizen of Malaysia who is fighting deportation charges. She entered the United States lawfully, but she failed to leave when required. As a result, she was charged by the former Immigration and Naturalization Service with overstaying her permitted time and she was placed in deportation proceedings on January 11, 1996. As we explain in more detail below, those proceedings

dragged on while the immigration authorities considered the question whether Duad was entitled to adjust her status based on her marriage to a U.S. citizen. Eventually she withdrew that application and requested only suspension of deportation. First an immigration judge ("IJ") and later the Board of Immigration Appeals ("Board" or "BIA") denied that request, and Duad now petitions for review of that decision. We lack jurisdiction over Duad's complaint that the Board erred when it found that she had not established extreme hardship; to the extent she has presented legal arguments, we find no merit in them. We therefore deny her petition for review.

**I**

Duad grew up in both Singapore and Malaysia; she then attended the Japanese Art School, in Tokyo, for her higher education. In 1963, she married a Malaysian man, Abdullah Mazlan, with whom she had two sons and a daughter. Duad and Mazlan divorced in 1976, apparently because Mazlan decided to take on two additional wives. After the divorce, Duad stayed in Malaysia for a time. In 1984, she took a job in the United States as a non-immigrant, working with the Malaysian Consulate as a student counselor. Since that time, she has resided continuously in the United States, leaving the country only twice on work-related matters, each time for a period of no more than 10 days. Her daughter has become a legal permanent resident and is married to a U.S. citizen; her grandchildren also reside in the United States.

In the late 1980s, Duad converted from Islam to Buddhism. In 1989, she met and married Kimberly Shastal, a U.S. citizen and another Buddhist. This marriage lasted for nearly two years, but it broke up when Shastal had an affair and got another woman pregnant. Before the marriage ended, however, Shastal filed an I-130 petition seeking to adjust Duad's status to that of a permanent resident. The INS denied his petition on February 19, 2004, finding that the marriage was a fraud.

Shortly after her divorce from Shastal was final, in November 1991, Duad married a Jewish man named Michael Baraz, another U.S. citizen. The two lived in a Chicago suburb, and Duad ran a small daycare service from their home. In October 1998, a child named Gabriella who had been in Duad's care died from a cerebral hematoma. Duad was charged with homicide, but after a trial, she was acquitted. Gabriella's parents then sued for wrongful death; that case ended when Baraz's insurance company agreed to a monetary settlement of $693,000. Later, the state authorities revoked Duad's daycare license. Duad then worked odd jobs (without, she concedes, employment authorization) and took courses at National-Louis University and Triton College. In late 2004, she and Baraz began divorce proceedings to end their 13-year marriage.

Duad would have liked to stay in the United States for a number of reasons. First, she has no close family in Malaysia; all of her living children and grandchildren are in the United States. Second, she asserts that she fears religious persecution, because Malaysia is predominantly

Muslim and is intolerant toward both Buddhism and Judaism. Also, because the retirement age in Malaysia is 55, Duad fears that she would be unable to support herself there.

By the time all was said and done, the only question before the IJ was whether Duad was entitled to suspension of deportation pursuant to the former § 244(a)(1) of the Immigration and Nationality Act. See 8 U.S.C. § 1254, repealed by Pub. L. No. 104-208, as set forth in 8 U.S.C. § 1101 note. In order to be qualified for that relief, the IJ continued, Duad had to show three things: (1) that she had been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of her application; (2) that she had been a person of good moral character during that time; and (3) that her deportation would result in extreme hardship to herself or to her U.S. citizen children. Only the second and third elements were at issue. Giving Duad the benefit of the doubt, the IJ concluded that he could not find as a matter of law that she lacked good moral character based on either her fraudulent marriage to Shastal or the unfortunate death of Gabriella. Turning to the "extreme hardship" factor, however, the IJ weighed the equities on both sides of the question. He acknowledged that deportation would cause hardship to Duad, but he also observed that country conditions in Malaysia were not as bleak as she painted them to be. After summarizing the various pertinent facts, the IJ concluded as follows:

> In assessing [Duad's] case, I have weighed the favorable factors . . . against the adverse factors in this case. It is the assessment of this Judge that given the negative factors, specifically the visa fraud and the reports of child injuries and the death of Gabriella . . ., that these favorable factors are not able to outweigh the negative factors in the case.

The IJ thus denied her request for suspension of deportation.

Duad appealed to the BIA, which adopted the IJ's decision with additional comments on the question of hardship. It reviewed the facts again and expressly agreed that the negatives outweighed the positives in her case. The Board added that Duad conceded that she was deportable as charged, and that it was her burden to establish that any requested relief should be granted in the exercise of discretion. The IJ, it held, did not abuse that discretion when he decided to deny suspension of deportation. Finally, in response to Duad's complaint on appeal that the IJ had violated her due process rights and statutory rights to a fair hearing, the Board found that the procedures had been adequate. The IJ, it thought, had not relied on the documentary evidence that she was challenging. Although a letter of December 2, 1999, from Illinois's Department of Children and Family Services ("DCFS") was technically hearsay, the Board held that it could nonetheless be considered when determining an alien's eligibility for relief from removal.

**II**

Duad's petition for review raises two primary arguments: first, that the Board erred in its acceptance of the hearsay documents and violated Duad's right to due process in doing so; and second, that these documents were all that permitted the IJ "to come to his holding that petitioner did not meet the requirement of good moral character." To the extent that this operates as a concession that this court lacks jurisdiction to review the merits of the hardship finding, it is a wise step to take. As a result of 8 U.S.C. § 1252(a)(2)(B)(ii), we have no jurisdiction to review the Attorney General's denial of discretionary relief. See, *e.g.*, *Kucana v. Mukasey*, 533 F.3d 531, 538 (7th Cir. 2008). Constitutional claims and questions of law, in contrast, do lie within our jurisdiction, by virtue of 8 U.S.C. § 1252(a)(1)(D).

The government begins by urging us to reject Duad's petition at the threshold because the BIA's decision was based on two independent grounds (the failure to show extreme hardship and the permissibility of using the contested evidentiary materials), and our lack of jurisdiction over the hardship ground leaves it in place as a justification for the denial of relief. This position depends, however, on a finding that the constitutional and legal arguments that Duad wants to present are wholly separate from the hardship finding. She argues that they are not, and that if the contested materials had been excluded, then the Board might have reached a different conclusion on hardship.

Looking at this record, we are inclined to agree with the Board that the contested materials played little or no role in the IJ's decisionmaking process. The IJ had before him a decision from the Board dated October 6, 2005, in which it found that substantial and probative evidence existed showing that Duad's marriage to Shastal was entered into for purposes of evading the immigration laws. The IJ also heard oral testimony about Gabriella's death and the investigation surrounding it. Duad herself testified about the incident. This evidence, standing alone, would have been enough to support the IJ's finding that on balance Duad did not merit withholding of deportation. Although Duad suggests that the IJ also found that she was not of good moral character, this is a misreading of his opinion. In fact, as we noted earlier, the IJ concluded that the facts did not support such a finding. What he did instead was to weigh those same facts insofar as they bore on the hardship issue. There is no legal bar against his doing so, and (to repeat) we have no jurisdiction to consider the factual soundness of his conclusion.

Duad also argues that the IJ's decision to admit various unsworn documents violated her due process rights. Nothing in the due process clause, however, precludes the use of hearsay evidence in administrative immigration proceedings. *Cf. Richardson v. Perales,* 402 U.S. 389, 402 (1971) (permitting use of hearsay evidence in Social Security disability administrative proceedings). Indeed, such a rule would severely penalize many asylum seekers, who manage to slip out of their country of origin with only a few crucial documents and other written

materials that could never be authenticated by traditional courtroom practices. Granting the fact that the evidence must, in the final analysis, be reliable, see *Niam v. Ashcroft,* 354 F.3d 652, 659 (7th Cir. 2004), we see nothing in the documents here that would render them so suspect that the Constitution would be violated by their use. Duad appears to be most concerned about the December 2, 1999, letter from DCFS, informing her that it was referring her daycare center to the Central Office of Licensing with a recommendation that her license be revoked and her application for renewal be denied. Duad's lawyer did not receive a copy of that letter until the morning of the proceeding, and Duad now complains both that the letter was highly prejudicial and that this was a fundamentally unfair way to proceed.

There was nothing unreliable about the letter, however, and Duad herself knew even before the proceeding that DCFS had taken exactly the steps that the letter outlined. We can appreciate her lawyer's dismay when he realized that he would need to contend with this damning piece of evidence, on top of everything else, but he had no legal right to avoid it. Importantly, the letter did not introduce an entirely new theory or line of inquiry into the case, and so Duad was not prejudiced in the legal sense of the term by its late disclosure.

In summary, we have no jurisdiction to review the Board's conclusion that Duad has not shown the kind of extreme hardship necessary to earn suspension of deportation; to the extent that she has raised legally cognizable

arguments in this petition, we reject them and DENY the petition for review.