In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3578

MANUELA D. MALAVE,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.

ARGUED SEPTEMBER 22, 2009—DECIDED JUNE 29, 2010

Before EASTERBROOK, *Chief Judge*, and BAUER and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Manuela Malave, a citizen
of Nicaragua, was ordered removed from the United
States after an immigration judge concluded that she
had paid $1,000 to her ex-husband to enter into a sham
marriage for the purpose of securing an immigration
benefit. Malave applied for cancellation of removal under
§202 of the Nicaraguan Adjustment and Central American
Relief Act, 111 Stat. 2193, as amended by 111 Stat. 2644

(1997). Section 202 of NACARA is reproduced as a note following 8 U.S.C. §1255. But the IJ's finding of a sham marriage made her inadmissible under §212(a)(6)(C)(i) of the Immigration and Nationality Act, 8 U.S.C. §1182(a)(6)(C)(i), so §202(a)(1)(B) of NACARA precluded relief. The Board of Immigration Appeals dismissed her appeal in a brief order.

Section 202(f) of NACARA forbids judicial review of a decision denying a motion for adjustment of status, and the Attorney General asks us to dismiss Malave's petition. The parties have debated the interesting question whether 8 U.S.C. §1252(a)(2)(D), part of the Real ID Act, permits review of legal questions notwithstanding §202(f) of NACARA, but this is not a subject we need explore. For what §202(f) says is: "A determination by the Attorney General as to whether the status of any alien should be adjusted under this section is final and shall not be subject to review by any court." This does not bar review of the order of removal itself, as some sections of the Immigration and Nationality Act do. See, e.g., 8 U.S.C. §1252(a)(2)(C) ("no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section 1182(a)(2) or 1227(a)(2)(A)(iii), (B), (C), or (D) of this title").

Malave contends that the order of removal is defective because the IJ did not hold a hearing that complies with 8 U.S.C. §1229a(b)(4)(B), which directs the agency to afford each alien "a reasonable opportunity to examine the evidence against the alien, to present evidence on the

alien's own behalf, and to cross-examine witnesses presented by the Government". Section 202(e)(2) of NACARA requires the Attorney General to follow §1229a. A need to give every alien one complete hearing does not impinge on the Attorney General's plenary authority to decide whether, on a properly compiled record, the alien is entitled to adjustment of status. To the extent there is any ambiguity about the way in which §202(f) of NACARA interacts with the general grant of jurisdiction in §1252(a), we resolve it by "the presumption favoring judicial review of administrative action". *Kucana v. Holder*, 130 S. Ct. 827, 839 (2010).

Manuela Gaula married Jose Antonio Malave Cruz on August 8, 1996, and took his family name. Four months later, Jose filed an I-130 petition on her behalf, asking immigration officials to adjust her status to that of permanent resident on the basis of her marriage to a citizen. Manuela filed a corresponding I-485 petition. *Afzal v. Holder*, 559 F.3d 677 (7th Cir. 2009), discusses how this process works. In September 1997 Manuela and Jose were interviewed, both jointly and separately, by immigration officials. During the separate portion of this interview, Jose signed a statement that he had been paid $1,000 to marry Manuela. He withdrew his I-130 petition. The interview with Jose was not recorded, and Manuela did not see a copy of Jose's statement until 2002, when she obtained her immigration file under the Freedom of Information Act.

Manuela was taken into custody immediately after the interview with Jose ended but was released that evening.

She relates that an agent of the FBI told her that he had investigated, concluded that the marriage had been genuine, and informed immigration officials so. Despite releasing her, the agency commenced removal proceedings and denied her petition for adjustment of status as a citizen's spouse. Manuela says that she has been unable to locate Jose since the day of the interviews.

The removal proceeding was closed later in 1997 after Congress enacted NACARA, which provides for adjustment of status for citizens of Nicaragua who entered the United States before December 1, 1995, have been in this nation continuously since, and are not statutorily ineligible for admission. Manuela applied for the statute's benefits. She next heard from the agency in 2005, when it denied her application on the ground that a fraudulent marriage made her ineligible for admission and derivatively ineligible under NACARA. The agency then reinstituted removal proceedings.

A hearing began in December 2006 and was conducted in stages. During the first, the agency's lawyers offered two versions of Jose's statement. Both were in English, a language that Manuela says Jose does not understand. (She tells us that he was born and raised in Puerto Rico. Many U.S. citizens from that commonwealth understand only Spanish.) The first is handwritten, by a different hand than the signature, and reads:

> Manuela Gaula gave me $1,000 to marry her so she could get her green card. I never lived with her & never slept or had sex with her. I don't even know her address but I do know the street name, Delaware.

The second, which is typed, reads:

> [Manuela] offered me $1,000. She never told me it was illegal and I did not realize it was wrong until after we were married, on August 8, 1996 in Lake County at the courthouse in Waukegan. The[] day we married she paid me the $1,000 cash. There was no other person involved in our arrangement and there were no witnesses at the marriage. We never dated or had any romantic involvement. I think she lives with a man she is not married to and I think their address is 1928 Delaware, Waukegan. We came to the Immigration office today for our interview and the officer who interviewed us . . . said that it could be prejudicial to me if I didn't tell the truth about our marriage; so I said I would rather cancel my application for Manuela Gaula, and tell the truth.

Manuela's lawyer objected to the receipt of these statements in evidence, contending that they had not been authenticated or disclosed before the hearing. Manuela also maintained that the details of the statements (such as whether she had lived with and had sexual relations with Jose), could be refuted by admissible evidence. The IJ then recessed the hearing.

When it was resumed in mid-January 2007, Manuela not only presented some evidence to contradict Jose's purported statements but also asked the IJ to issue a subpoena, so that Jose could be compelled to attend and be subjected to cross-examination. The IJ refused, stating that if Manuela had not found Jose during the decade

since the 1997 interview, she was never going to find him. The IJ did not consider asking federal agents to enforce the subpoena (nor did the BIA discuss that possibility on appeal). After admitting the two statements into evidence, the IJ again recessed the hearing. The final stage of the hearing came on March 12, 2007, when Manuela testified that she did not pay Jose, that the marriage had been consummated, and that the couple lived together for approximately ten months until she threw him out after finding him in bed with another man. The IJ then rendered an oral opinion stating that he believed the statements attributed to Jose. This led to the finding of fraud, the denial of relief under NACARA, and the order of removal.

Part of Manuela's brief is devoted to the proposition that the IJ violated the due process clause of the fifth amendment by admitting and relying on hearsay evidence. (Jose's statements are hearsay because they are out-of-court declarations used for the truth of the matter stated.) This line of argument is unnecessary. If as Manuela contends the hearsay statements are unreliable, then the agency's decision is not supported by substantial evidence and may be set aside under standard principles of administrative law without any need for constitutional theorizing.

No one doubts that aliens are entitled to due process of law in removal hearings, and that administrative decisions must stand on a better footing than speculation. See *Bridges v. Wixon*, 326 U.S. 135, 156 (1945). But statutes such as 8 U.S.C. §1229a(b)(4)(B), and regulations such as 8 C.F.R. §1240.1(c), guarantee to aliens notice and an opportunity for a fair hearing. Appeals to "due process"

often come at the expense of arguments based on these concrete procedural entitlements. That's one reason why we have advised aliens and their lawyers to omit due-process contentions unless they believe that the statutes and regulations that govern removal hearings are constitutionally deficient. See, e.g., *Rehman v. Gonzales*, 441 F.3d 506, 508–09 (7th Cir. 2006).

Perhaps Manuela's lawyers believe that they must make a due-process argument because neither the statute nor any regulation forbids the use of hearsay. But then neither does the due process clause. Hearsay is regularly used in administrative adjudication, and for that matter criminal sentencing. In *Richardson v. Perales*, 402 U.S. 389 (1971), the Justices roundly rejected the argument that the due process clause creates for administrative adjudication the same constitutional requirement of live testimony that the confrontation clause establishes for criminal trials. The Court added that hearsay could supply substantial evidence for an administrative decision. See also, e.g., *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229–30 (1938); *Duad v. Holder*, 556 F.3d 592, 595–96 (7th Cir. 2009).

*Perales* has a proviso of consequence here. The Court wrote that hearsay "may constitute substantial evidence supportive of a finding by the hearing examiner adverse to the claimant, when the claimant has not exercised his right to subpoena the [declarant] and thereby provide himself with the opportunity for cross-examination". 402 U.S. at 402. Manuela tried to take advantage of that proviso, but the IJ refused to issue a subpoena for Jose. And that's a big problem, not only under the

proviso in *Perales* but also under §1229a(b)(4)(B), which entitles aliens to cross-examine adverse witnesses. The bureaucracy can't nullify that right by presenting written declarations rather than live testimony. A declarant is a "witness" when testimony comes in on paper, no less than when it is offered in person. Cf. *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527 (2009).

Several circuits have concluded that, when an alien wants to cross-examine a witness, the agency not only must issue a subpoena but also must use reasonable efforts to enforce that subpoena (which the alien may lack the resources to do). See *Ocasio v. Ashcroft*, 375 F.3d 105, 107 (1st Cir. 2004); *Olabanji v. INS*, 973 F.2d 1232, 1234 (5th Cir. 1992); *Dallo v. INS*, 765 F.2d 581, 586 (6th Cir. 1985); *Saidane v. INS*, 129 F.3d 1063, 1065 (9th Cir. 1997). We need not decide when assistance with enforcement is required—or what kind of assistance is necessary—because here the IJ refused to issue a subpoena in the first place.

The IJ did not find the request untimely. The hearing was just about to recess for two months, so a subpoena would not have occasioned any additional delay. Nor did the IJ rely on 8 C.F.R. §1003.35(b)(2), which requires an alien to make a "diligent effort" to locate the witness before requesting a subpoena. (The Attorney General's brief in this court likewise does not mention §1003.35(b)(2).) Instead the IJ stated that a subpoena would be futile, because if Manuela had not found Jose in the last ten years, she never would. That's not a good reason. Manuela was not looking for most of that time. Until 2005, when the agency renewed its request for her removal, she had no

reason to. And Manuela is not a professional skip tracer. She does not know how to locate people who don't want to be found. That expertise exists in both the government and the private market, however, and a subpoena could have been turned over to a professional with experience in finding people who did not leave forwarding addresses.

A prediction that a person can't be found, or that cross-examination won't be fruitful, is a poor reason to deny a litigant the statutory entitlement to cross-examine adverse witnesses. The best way to find out whether a subpoena will work is to issue one. Jose Malave may be dead or untraceable, and if so the hearing would have proceeded as it did; no harm would have been done (and no delay would have ensued). But he might have turned up.

None of this is to say that Jose's statements are so outré that an agency is forbidden to rely on them. Bogus marriages designed to obtain immigration benefits are regrettably common, and the agents who interview the applicants have every reason to separate the real marriages from the spurious ones. They don't get a bonus for imputing immigration fraud to honest people. Section 202(f) of NACARA insulates from judicial review the decision whether to believe particular evidence of immigration fraud. But before exercising this unreviewable power, the IJ, as the Attorney General's delegate, must furnish the alien with compulsory process to seek the adverse witness's presence, so that the truth of the writings may be tested.

The petition for review is granted, and the matter is remanded to the agency for further proceedings consistent with this opinion.