In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2198

MOHSEN KARROUMEH,

*Petitioner,*

*v.*

LORETTA E. LYNCH, Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
A076-296-363

ARGUED JANUARY 20, 2016 — DECIDED APRIL 29, 2016

Before WOOD, *Chief Judge*, and MANION and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Mohsen Karroumeh petitions for review of a final order of removal issued by the Board of Immigration Appeals ("BIA" or "Board"). The Board determined that Karroumeh was removable because he entered into a sham marriage for immigration purposes. We conclude that

Karroumeh is entitled to a new hearing before an immigration judge ("IJ") because he was prejudiced by his inability to cross-examine a key government witness whose evidence was presented through a written statement. We grant the petition and remand for a new hearing.

## I.

Karroumeh is a native and citizen of Jordan who was admitted to the United States as a visitor on May 2, 1996. At that time, he was married to a Jordanian woman with whom he had two children. In October 1996, he obtained a proxy divorce from his wife, and in February 1997, he married Terri Wright, a United States citizen who also had two children. A few months later, Wright filed a Form I-130, Petition for Alien Relative ("Petition"), on Karroumeh's behalf, in conjunction with a Form I-485, Application to Register Permanent Residence or Adjust Status ("Application"). The Petition and Application were conditionally granted in June 1998. *See* 8 U.S.C. § 1186a. In July 2000, Karroumeh and Wright timely filed a Form I-751, a joint petition to remove the conditions from Karroumeh's lawful permanent resident status. *See* 8 U.S.C. § 1186a(c)(1)(A). United States Citizenship & Immigration Services ("USCIS") granted the joint petition in January 2001, and the conditions were removed from Karroumeh's lawful permanent resident status. *See* 8 U.S.C. § 1186a(c)(3)(B).

Several months later, in May 2001, Karroumeh filed his first application for naturalization. During a February 2002 naturalization interview with USCIS, when questioned about the absence of his U.S. citizen wife, Karroumeh revealed that he and Wright were in the process of obtaining a divorce. A week

later, Karroumeh withdrew his application. In March 2002, his divorce was finalized. In April 2003 and September 2006, Karroumeh filed two more applications for naturalization. In 2008, USCIS began to investigate Karroumeh for immigration fraud.

In the course of that investigation, USCIS officer Leslie Alfred obtained a sworn statement from Wright in December 2008, more than six years after her divorce from Karroumeh. Although Alfred questioned Wright extensively about her living situation during and after the marriage, her ambiguous and sometimes contradictory responses raised as many questions as they answered. In the interview, Wright revealed that she had moved to Columbia, Mississippi in November 1997, approximately nine months after she married Karroumeh, when her mother was jailed. But she also admitted that she registered her car in Mississippi in August 1997, and later said that she left for Mississippi in May 1997, which would have been only three months after she married Karroumeh. She said that she stayed in Mississippi for a year, paying the rent at the Columbia address until her mother was released from jail. She said both that she returned to the Chicago area in November 1998, and also that she moved to Hinsdale, Illinois in 2000, after moving back from Mississippi. She said that she separated from Karroumeh and began living apart from him in late 2000, and also that they "never lived together." R. at 516. She later said that they "spent time together as a family, but we never lived together as a husband and wife." R. at 517.

At the time of the December 2008 interview, Wright was living on South Springfield in Chicago, and had been living

there nearly two years. Prior to that, she resided on West Cortez in Chicago for three years. When asked about registering her car during her marriage at addresses on Racine in Chicago, and on Clarendon Hills Road in Willowbrook, she replied that she only used the apartment in Clarendon Hills.[1] When asked directly if she and her children ever lived with Karroumeh, she replied that, when she was living in Hinsdale, "for 3 or 4 days out of the week he would come over. We were never on each other's lease." R. at 514. She also said that she "stayed with him a few nights at Worth," a suburb of Chicago where Karroumeh leased an apartment. R. at 514. When told that records showed she never lived at Karroumeh's Worth address, Wright cryptically replied, "You are correct lease wise." R. at 515. When Alfred asked why her signature appeared on two of Karroumeh's Worth leases, she replied, "This is because he gave them to me. He already signed the leases, I just signed it. I knew he was doing some bull crap, so I just got my own place." R. at 515.

Alfred also asked Wright if she ever thought that Karroumeh married her just to get his green card, and she replied, "I felt he didn't want to live with me." R. at 517. She recalled signing a lease with Karroumeh before she left for Mississippi in May 1997, and said that he told her they could move into a two bedroom apartment, but that he never followed through in getting the larger apartment, causing her to feel that he did not wish to live with her. She filed one joint tax return with him, in 1999, and received a $2000 refund. She

---

[1] Clarendon Hills is both the name of a road in Willowbrook, a suburb of Chicago, and the name of a separate suburb, just north of Willowbrook.

did not know why her name and social security number were on Karroumeh's taxes for 1998 and 2000. Over the course of the marriage, Karroumeh gave Wright a little more than $4000, including $200 on their wedding day, $500 for clothing for her children, and the tax refund. As a result of the investigation, USCIS denied Karroumeh's 2006 application for naturalization.

In June 2012, Karroumeh filed a "Petition for a Hearing on Naturalization Application" in the district court in the Northern District of Illinois. In October 2012, the Department of Homeland Security ("DHS") commenced removal proceedings, serving Karroumeh with a Notice to Appear alleging that he had procured his lawful permanent resident status through fraud. *See* 8 U.S.C. § 1227(a)(1)(A). In particular, DHS asserted that he had married a United States citizen solely to obtain an immigration benefit. Because Karroumeh had filed an action in the district court, DHS sought expedited proceedings in the parallel removal action. Karroumeh denied the charges at his first appearance before the IJ on February 13, 2013. The IJ ordered DHS to file its evidence supporting the charge by May 13, 2013, and set a merits hearing for August 6, 2013. In April 2013, for reasons not apparent from the record, the IJ rescheduled the merits hearing to September 5, 2013. DHS submitted its evidence in support of the charge and indicated that it intended to present five witnesses at the hearing: Wright, her two children, Karroumeh's property manager Lance Olson, and Leslie Alfred, the USCIS investigator who had taken the sworn statement from Wright. DHS also filed a motion with the IJ requesting issuance of a subpoena requiring Wright and her children to appear at the September 5, 2013 hearing. The IJ

granted the motion for a subpoena but there is no evidence in the record that the subpoena was served on Wright.

The IJ moved the merits hearing one last time, to January 10, 2014. But no new subpoena was issued for Wright requiring her appearance on the new date. And she did not in fact appear on that date. On the day of the hearing, when the IJ asked government counsel whether Wright was available to testify, counsel replied, "None of those that have been subpoenaed have appeared for today's hearing, Your Honor." R. at 101. DHS then presented the testimony of Leslie Alfred. Alfred authenticated sworn statements from Wright and from Lance Olson, and then testified regarding his investigation into the legitimacy of the marriage. In particular, Alfred cited as suspicious the short amount of time between Karroumeh's divorce from his Jordanian wife and his marriage to Wright, Wright's statements that the couple never lived together, the money that Karroumeh gave Wright during the marriage, discrepancies regarding the filing of joint tax returns, Wright's hesitation when asked if she and Karroumeh had consummated the marriage, and differences between Wright's testimony regarding the date of separation and the date noted on the divorce decree, among other things. Karroumeh testified both as an adverse witness in the DHS case-in-chief and on his own behalf.

Although Karroumeh objected to the admission of Wright's sworn statement, the IJ concluded during the hearing that the document was admissible:

> Now the Government is contending that your wife's statement supports their conclusion that your

marriage was a sham. Mr. Adkinson [Karroumeh's lawyer] has argued that that's not true and that I should not even consider your wife's statement. However, the Government has made an attempt to have your wife come to court. They subpoenaed her to come to court and she has not appeared. They could not locate her and she could not come to court. A third-party affidavit submitted by an out-of-court declarant is admissible in evidence where the Government has made an attempt to have that witness present. You also said that you didn't even know where your wife was and you were not able to have her come to court. So the Government does have the right to use your wife's statement against you.

R. at 201–02. The IJ again ruled that Wright's sworn statement was admissible in the final oral ruling:

The respondent's attorney objected to the Court's reliance on the affidavit of Terri Wright taken by the DHS [sic] Officer Leslie Alfred. It is true that evidence is only admissible if it is relevant and fundamentally fair to both sides. Here, however, I find that the admission of Terri Wright's affidavit in the course of USCIS' investigation was not fundamentally unfair to the respondent. The Government attorney made every effort to locate and bring Terri Wright to court to testify. They had asked the respondent for her address and asked for help in locating her. They asked the Court for the issuance of a subpoena, which was granted. Where the

> Government has made every effort to present an
> adverse witness, the admission of a third party's
> statement is not fundamentally unfair.

R. at 81–82.

The IJ ultimately concluded that the government met its burden of demonstrating that Karroumeh's marriage to Wright was not bona fide. In both his oral and written rulings, the IJ emphasized the importance of Wright's sworn statement in reaching that conclusion. In the final oral decision, the IJ relied on Wright's statement to demonstrate (1) that there was no period of time where Wright and Karroumeh lived together at the same address; (2) that Wright was living in Mississippi when she obtained an Illinois driver's license; (3) that Wright never lived at Karroumeh's Worth apartment; (4) that Wright never signed a lease with Karroumeh but that Karroumeh had manufactured evidence by having her sign leases after the fact; (5) that the date of separation in the divorce decree was false; and (6) that Karroumeh gave Wright money on multiple occasions, including in exchange for filing a joint tax return, as payments for entering into the marriage. In determining what weight should be accorded the Government's evidence and whether the government had met its burden of proving by clear and convincing evidence that the marriage was a sham, the IJ stated:

> First, the statement of Terri Wright is extremely
> damaging to the respondent. While she did not
> admit that she was paid money solely to enter into
> the marriage, everything about the statement sug-
> gests that the respondent fabricated evidence to

> contend that his marriage was a true marriage and
> that he was residing together with his spouse. The
> statement from Terri Wright supports the conclusion
> that the marriage was not entered into in good faith.

R. at 82. The IJ also cited the testimony of Alfred, which, of course, was based in part on his interview with Wright. In summing up the evidence, the IJ cited the quick succession of Karroumeh's arrival in the United States, proxy divorce and marriage to Wright; the evidence that the couple never lived together; and Karroumeh's manufacture of evidence such as Wright's Illinois driver's license, the leases, and the 1999 tax return. The IJ ordered that Karroumeh's lawful permanent resident status be terminated and that he be granted voluntary departure.

On appeal, the BIA affirmed the IJ's determination that Karroumeh was removable because he entered into a sham marriage for immigration purposes. Addressing Karroumeh's argument that the IJ failed to properly enforce the subpoena issued to Wright, the BIA found that only the party seeking the subpoena could claim the benefits of the enforcement provision found at 8 C.F.R. § 1003.35(b)(6). The BIA also rejected Karroumeh's claim that Wright's sworn statement should not have been allowed as evidence because Wright was not present at the hearing for cross-examination. Because the government made reasonable efforts to procure Wright's presence and because Karroumeh had an opportunity to cross-examine Alfred, the agent who took Wright's statement, the BIA concluded that the statement was properly admitted as evidence. The BIA found that the government adequately established removability, and ordered Karroumeh's removal

to Jordan. Karroumeh petitions this court for review of that order.

**II.**

In his petition for review, Karroumeh contends that his statutory and due process rights to cross-examine Wright were violated when the IJ and BIA relied on Wright's sworn statement even though the government failed to make reasonable efforts to procure her presence at the hearing. Karroumeh asserts that he was prejudiced by this error because there was little basis for finding that his marriage was a sham without Wright's sworn statement. The government responds that it did in fact make reasonable efforts to bring Wright to the hearing and that those efforts are sufficient under the statute to allow the sworn statement to be used against Karroumeh. The government also asserts that it met its burden of demonstrating by clear and convincing evidence that Karroumeh married Wright for the sole purpose of obtaining immigration benefits.

"When the Board agrees with the decision of the immigration judge, adopts that decision and supplements that decision with its own reasoning, as it did here, we review the immigration judge's decision as supplemented by the Board." *Cece v. Holder*, 733 F.3d 662, 675 (7th Cir. 2013) (*en banc*). We review the findings of fact for substantial evidence and reverse only if the evidence compels a different result. *Cece*, 733 F.3d at 675–76. We review questions of law *de novo*, deferring to the Board's reasonable interpretation set forth in precedential opinions interpreting the statute. *Chevron, U.S.A., Inc. v. Natural*

*Resources Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984); *Cece*, 733 F.3d at 668–69.

In seeking to remove Karroumeh from the United States, the government bore the burden of proving by clear and convincing evidence that he was deportable, and that his marriage to Wright was a sham, entered into for the purpose of obtaining immigration benefits. *See* 8 U.S.C. § 1229a(c)(3)(A). Aliens in removal proceedings are entitled to due process of law under the Fifth Amendment. *Pouhova v. Holder*, 726 F.3d 1007, 1011 (7th Cir. 2013). The immigration statutes also impose procedural requirements on removal proceedings, and any proceeding that meets those requirements also satisfies constitutional due process. *See Pouhova*, 726 F.3d at 1011. One of the statutory procedural guarantees is the right to a reasonable opportunity to cross-examine witnesses presented by the government. 8 U.S.C. § 1229a(b)(4)(B); *Pouhova*, 726 F.3d at 1011; *Malave v. Holder*, 610 F.3d 483, 487 (7th Cir. 2010). The right to cross-examine adverse witnesses extends to those whose statements are presented in written declarations as well as those presented through live testimony. *Malave*, 610 F.3d at 487. "A declarant is a 'witness' when testimony comes in on paper, no less than when it is offered in person." *Malave*, 610 F.3d at 487. In challenging the BIA's decision, Karroumeh must demonstrate not only that this right was denied but also that he was prejudiced by the denial. *Pouhova*, 726 F.3d at 1011. We review *de novo* the legal question of whether the admission of a document violated a petitioner's procedural rights in a removal proceeding and, if so, whether the admission was prejudicial. *Pouhova*, 726 F.3d at 1011–12.

The IJ found that the admission of Wright's statement did not violate Karroumeh's procedural rights because the government used reasonable efforts to procure Wright's attendence at the hearing. We have expressed doubt whether the use of "reasonable efforts" to procure the presence of the witness is adequate to ensure the fairness of admitting documents whose declarants cannot be cross-examined. *Pouhova*, 726 F.3d at 1015; *Malave*, 610 F.3d at 487–88. But as in *Pouhova* and *Malave*, we need not resolve that question here because the record demonstrates that the government failed to make reasonable efforts to locate Wright and compel her presence at the hearing.

The very limited record on this issue demonstrates that the government asked the court to issue a subpoena compelling Wright's appearance at the September 5, 2013 hearing. There is no evidence in the record that the subpoena was served on Wright. But more importantly, when the IJ moved the date of the hearing to January 10, 2014, the government did not request a new subpoena for that date and the court did not issue an updated subpoena. Other than seeking a subpoena for the wrong hearing date, there is no evidence in the record regarding the government's efforts to secure Wright's presence at the hearing. Nor did the IJ follow through on the regulatory requirement to seek the assistance of the United States Attorney and the district court in enforcing the subpoena. Section 8 C.F.R. § 1003.35(b)(6) states that, if a subpoenaed witness "neglects or refuses to appear and testify as directed … the Immigration Judge issuing the subpoena shall request the United States Attorney … to report such neglect or refusal to the United States District Court and to request such court to issue an order requiring the witness to appear and testify[.]"

The BIA's conclusion that only the party seeking the subpoena could claim the benefits of the enforcement provision found at 8 C.F.R. § 1003.35(b)(6) may be correct but it is irrelevant here: as the party seeking to use Wright's sworn statement, the government was required to use reasonable efforts to secure Wright's presence at the hearing, and yet the government failed to employ this readily available tool. The government has resources to locate persons who do not wish to be found. *Malave*, 610 F.3d at 488. Indeed, the government found Wright previously, when it wanted to interview her regarding her marriage to Karroumeh. "A prediction that a person can't be found, or that cross-examination won't be fruitful, is a poor reason to deny a litigant the statutory entitlement to cross-examine adverse witnesses." *Malave*, 610 F.3d at 488. Although the government repeatedly invokes the phrase "reasonable efforts" in its brief, it has never set forth what those efforts entailed. Left with a record that shows nothing more than a single, unserved subpoena for the wrong date, we cannot conclude that the government used reasonable efforts to secure Wright's presence at the hearing. Karroumeh has demonstrated that his procedural right to cross-examination was violated.

We turn to the question of prejudice. Wright's statement was the primary piece of evidence cited by the IJ in supporting the decision. The IJ described the statement as "extremely damaging" to Karroumeh. In addition to Wright's statement, the evidence consisted of Wright's car registrations and driver's license renewal; a few photographs of the couple; the landlord's letter and sworn statement; leases; the divorce decree; and the time line of Karroumeh's entry into the United

States followed by his relatively quick proxy divorce and marriage to a United States citizen. Without Wright's statement, the government could not demonstrate by "clear and convincing" evidence that the marriage was a sham. Much of the evidence was consistent with Karroumeh's testimony that he and Wright mostly lived apart because his apartment was not large enough to accommodate her children, and because she temporarily moved to Mississippi for a period due to a family crisis. The photographs showed nothing more than Wright and her children with Karroumeh at an amusement park, and the wedding. The tax returns were jointly filed, and the leases were in the names "Mohsen and Terri Karroumeh." Without Wright's statement denying that she filed joint tax returns for two of the three relevant years, and that she signed the leases after the fact, the government presented little evidence that the marriage was a sham.

Evidence in removal proceedings need not strictly conform to the Federal Rules of Evidence, but the admission of evidence must be probative and fundamentally fair. *Pouhova*, 726 F.3d at 1011. Fairness, in turn, depends in part on the reliability of the evidence. *Id*. Hearsay is generally admissible in administrative proceedings, and may supply substantial evidence in support of an administrative decision, so long as there has been an opportunity for cross-examination. *Malave*, 610 F.3d at 487. As we noted above, Karroumeh had no opportunity to cross-examine Wright regarding her out-of-court statement.

Wright's statement is marked by contradictions and inconsistencies that call its reliability into question. For example, Wright gave three different dates for her move to Mississippi and two different dates for her return to Illinois.

She both denied signing leases with Karroumeh and also admitted signing them. Some of her statements beg for an explanation, such as her claim that she did not live with Karroumeh at his Worth address "lease wise." Wright gave the statement more than six years after her divorce from Karroumeh. In a response that could be interpreted as displaying bias , she said that she divorced Karroumeh because after "constant lie after lie, he never followed through with his plans like getting a house[.]" Karroumeh has been deprived of an opportunity to ask clarifying questions or pursue areas left unexplored by Leslie. In his appeal to the Board, Karroumeh noted that Leslie never directly asked Wright if she was engaged in a fraudulent marriage, never asked for the meaning of the term "lease wise," never inquired why Karroumeh gave Wright money during the marriage, and never asked whether Wright was prosecuted for marriage fraud. In light of the contradictions and inconsistencies as well as Wright's motive to testify against her ex-husband, her hearsay statement was unreliable and Karroumeh should have been allowed an opportunity to test it with cross-examination. The admission of her statement under these circumstances was not fundamentally fair. And without this evidence, the government could not meet its burden of demonstrating by clear and convincing evidence that the marriage was a sham. Karroumeh has thus established prejudice.

As we noted in *Pouhova*, it is unclear whether the government's reasonable efforts to locate a witness could render unreliable hearsay any more reliable or its use any more fair than if the government made no effort to secure the presence of the witness. 726 F.3d at 1015. Because the government did

not make reasonable efforts to bring Wright to the hearing, we reserve that question for a case where it would affect the outcome. In this case, it is clear that Karroumeh's procedural right to cross-examine the main witness against him was violated, and that this error was prejudicial. We therefore grant his petition and remand for a hearing that provides Karroumeh with all the procedural rights due to him.

PETITION GRANTED.