Ray **FULLER**, Petitioner,

v.

Loretta E. **LYNCH**, Attorney General of the United States, Respondent.

No. 15-3487

United States Court of Appeals, Seventh Circuit.

Submitted May 23, 2016 *

Decided August 17, 2016

---

* After examining the briefs and the record, we have concluded that oral argument is unnecessary. The petition for review is thus submitted on the briefs and the record. See Fed. R. App. P. 34(a)(2)(C).

Ray Fuller, Woodstock, IL, for Pro Se Petitioner.

OIL, Joanna L. Watson, Attorneys, Department of Justice, Civil Division, Immigration Litigation, Washington, DC, for Respondent.

Before WOOD, Chief Judge, and POSNER and ROVNER, Circuit Judges.

WOOD, Chief Judge.

Ray Fuller, a 51-year-old Jamaican citizen, petitions for judicial review of the denial of his applications for withholding of removal under the Immigration and Nationality Act ("INA") and withholding and deferral of removal under the United Nations Convention Against Torture ("CAT"). Fuller asserted a fear of persecution and torture in Jamaica based upon his claimed bisexuality, but an immigration judge deemed his testimony not worthy of belief and denied relief. We deny the petition.

Fuller came to the United States in 1999 with a fiancé visa sponsored by Carol Wood, a U.S. citizen. They soon married and in 2001 had a daughter. Fuller promptly received conditional permanent resident status, see 8 U.S.C. § 1186a(a), but then he and Wood failed to attend a

required interview with U.S. Citizenship and Immigration Services, and in 2004 his status was terminated. They divorced the next year.

In the meantime, also in 2004, Fuller had pleaded guilty to attempted criminal sexual assault, 720 ILCS 5/8-4(a), 5/12-13(a)(1) (since renumbered as 720 ILCS 5/11-1.20(a)(1) (West 2016)), and been sentenced to 30 months' probation. He later violated the conditions of his probation and in 2012 was resentenced to four years' imprisonment.

Upon Fuller's release from state custody in 2014, the U.S. Department of Homeland Security detained him and charged him as removable on three grounds: (1) for being convicted of an aggravated felony, 8 U.S.C. § 1227(a)(2)(A)(iii), defined as an attempt to commit a crime of violence, *id.* § 1101(a)(43)(F), (U), (2) for being convicted of a crime involving moral turpitude, *id.* § 1227(a)(2)(A)(i), and (3) for losing his conditional permanent resident status, *id.* § 1227(a)(1)(D)(i). The immigration judge ("IJ") sustained each ground of removability. The Board of Immigration Appeals agreed that Fuller was removable under § 1227(a)(1)(D)(i) for losing his conditional permanent resident status, but it did not address the other grounds. Fuller does not challenge his removability under § 1227(a)(1)(D)(i).

Along with his applications for relief from removal, Fuller submitted evidence— including the 2012 and 2013 U.S. State Department Human Rights Reports—documenting the severe abuse and discrimination suffered by lesbian, gay, bisexual, and transgender ("LGBT") persons in Jamaica. As chronicled in the reports, Jamaica criminalizes physical intimacy between persons of the same sex, and its police officers have been known arbitrarily to arrest, detain, and torture LGBT persons. See also *Bromfield v. Mukasey*, 543 F.3d 1071, 1076–77 (9th Cir. 2008) (finding a pattern or practice of persecution against gay men in Jamaica). We have no reason to doubt that general account of conditions in the country.

Fuller asserted that he is bisexual, and he testified about his experiences as a bisexual man in Jamaica and the specific incidents of harm and harassment he endured. He grew up in Kingston and said that as a preteen he began exploring sexual relationships with both men and women. Since then, he has identified as bisexual and continued to have relationships with both sexes. One of his relationships with a woman produced two children, a son born in 1986 and a daughter born in 1987, both of whom now live in the United States and are U.S. citizens. While attending college in Kingston, Fuller was attacked and at times stoned by other students. A few years later, when walking home from work, he was taunted for being gay by a group of men who took a knife to his face and sliced him. Another time he was robbed at gunpoint by a man who called him a "batty man," a Jamaican slur for a gay man. On another occasion, while partying with his boyfriend in the gay-friendly resort town of Ocho Rios, Fuller was shot in the back and buttock by someone in an "anti-gay mob" that had barged into the party. His sisters, after hearing about the shooting, expressed their disapproval of his sexual orientation and "disowned" him, and one sister kicked him out of her house. In 1997 Fuller became romantically involved with Wood, a former high-school friend who was visiting Jamaica. They married in 1999, lived together in the United States, and two years later returned to Ocho Rios for a belated honeymoon. Fuller testified that he also had been hoping to reconnect with his family, but they refused to see him. He told the IJ that while married to Wood he had multiple affairs with men and women.

The IJ denied all relief. She first concluded that Fuller's conviction for attempted criminal sexual assault—a class-two felony in Illinois for which he received a four-year prison term—was a "particularly serious crime" that barred him from withholding of removal under the INA and the CAT. See 8 U.S.C. § 1231(b)(3)(B)(ii); 8 C.F.R. § 1208.16(d)(2). She reached this conclusion by noting that the criminal statute, 720 ILCS 5/12-13(a)(1), punished the use of force or the threat of force to commit an act of sexual penetration, and Fuller's victim informed police that she told him several times during the encounter to stop and that he threatened to kill her.

The IJ then concluded that Fuller did not qualify for deferral of removal under the CAT. She deemed Fuller's credibility to be "seriously lacking," based on his "substantially inconsistent testimony and documentary evidence about many matters which go to the heart of his claims." The IJ did not believe Fuller's basic assertion that he is bisexual. Nor did she believe that the Jamaican government would regard him as such. She offered a number of reasons for these determinations, some of which, as the dissent points out, could be criticized for betraying a lack of understanding about bisexuality, but others of which rest on stronger grounds. Her questionable reasons included the fact that Fuller had been married to a woman, fathered children with two different women, and was convicted for sexual assault on a woman. None of those actions is necessarily inconsistent with a bisexual orientation; after all, the very word "bisexual" indicates that the person is attracted to both women and men. But the IJ relied on much more than a mistaken assumption that a bisexual man would not marry a woman, father children, or commit sexual assaults.

The IJ criticized Fuller for some glaring discrepancies in his written statement and testimony about the Ocho Rios shooting incident. In his written statement, for instance, Fuller said that he was shot during his college years, from 1983 to 1988, at a party hosted by his college boyfriend Henry; he testified, in marked contrast, that the shooting happened nearly a decade later at the house of a boyfriend named Steven in 1997, shortly before his sister kicked him out of her house. The IJ also was concerned about Fuller's admitted lie on an application he filed in 2001 seeking permission to travel back to Ocho Rios. There he wrote that he wanted to visit his sick mother in Jamaica, even though his mother at the time was actually living in the United States. Finally, throughout his testimony, Fuller confused his sisters' names, mixed up a sister with his mother, and gave different figures for the number of sisters that he had.

People may not remember what they had for lunch 20 or 30 years ago, but some experiences leave a greater imprint on the memory than others. It was entirely reasonable for the IJ to think that the experience of being shot falls in the latter category, and that someone for whom that is not an everyday event would remember whether he was shot while in college in the late 1980s or with a boyfriend in the late 1990s. The IJ was also on solid ground when she held against Fuller his inability to remember which boyfriend (Henry or Steven) was present at the shooting, as well as his inability to keep his sisters straight (how many could there have been?) and his lie about his mother's whereabouts. These discrepancies, and Fuller's unconvincing efforts to explain them, were all fair matter for the IJ's credibility determination.

Fuller tried to bolster his claim of bisexuality with seven letters from his children and friends, but the IJ offered sound reasons for refusing to credit them. She ex-

plained that none of the authors—including two ex-boyfriends living in California and Wisconsin—was available to testify in court. Worse, several of them were stylistically suspicious, in that they all had been signed "on a signature line made on a series of dots." The Ocho Rios shooting was mentioned in only a single letter, in which the author wrote that Fuller had been shot on multiple occasions, contrary to his testimony that he was shot only once. The IJ also doubted the reliability of Fuller's testimony that he had called the letter writers and several others while detained; according to jail telephone logs submitted by the government, he had made phone calls to only two numbers, and only one call went through.

The Board of Immigration Appeals upheld the IJ's decision. Regarding the IJ's conclusion that Fuller was barred from withholding of removal under the INA and the CAT, the Board agreed with the IJ that Fuller's conviction for attempted criminal sexual assault was a particularly serious crime. The Board considered the factors set forth in *Matter of R–A–M–*, 25 I. & N. Dec. 657 (BIA 2012), and *In re N–A–M–*, 24 I. & N. Dec. 336 (BIA 2007), and concluded that "reliable evidence" showed that Fuller had committed his crime by threatening the use of force, and that he had received a "significant sentence" for his serious conviction. The Board also found no clear error in the IJ's findings that Fuller "did not credibly testify and did not establish that he has ever been bisexual." And because Fuller had not established that he was bisexual or that he would be perceived in Jamaica as bisexual—the basis of his purported fear of torture—he had not met his burden of proof under the CAT.

Our authority over this petition for review is circumscribed by section 1252(b)(4) of Title 8, U.S. Code, which provides as follows:

Except as provided in paragraph (5)(B) [irrelevant here, as it addresses people with bona fide claims to be U.S. citizens]

(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based,

(B) the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary,

(C) a decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law, and

(D) the Attorney General's discretionary judgment whether to grant relief under section 1158(a) of this title shall be conclusive unless manifestly contrary to the law and an abuse of discretion.

No court shall reverse a determination made by a trier of fact with respect to the availability of corroborating evidence, as described in section 1158(b)(1)(B), 1229a(c)(4)(B), or 1231(b)(3)(C) of this title, unless the court finds, pursuant to with subsection (b)(4)(B) of this section, that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable.

Given this deferential standard, there inevitably will be cases in which the reviewing court, or some of its members, will disagree with administrative resolution of the issues, but section 1252(b)(4)(B) requires us to yield unless "any reasonable adjudicator would be compelled to conclude" that the IJ (or the Board) erred.

 In this petition for review, Fuller first challenges the agency's conclusion that his conviction for attempted criminal sexual assault is a particularly serious crime that disqualifies him from withholding of removal. He contends that the

Board erred by failing to adhere to its own precedent and considering improper factors. Fuller also maintains that the Board erred in deeming his conviction an aggravated felony, but the Board expressly declined to reach that issue and instead found him removable only under § 1227(a)(1)(D)(i). Moreover, a crime may be "particularly serious" without being an aggravated felony. See *Ali v. Achim*, 468 F.3d 462, 469–70 (7th Cir. 2006). The Board relied on its precedent and appropriately considered relevant factors such as the elements of Fuller's offense, the sentence he received, and the circumstances underlying the conviction. We lack jurisdiction to review the agency's weighing of those factors in the course of determining whether a crime is particularly serious. See 8 U.S.C. § 1252(a)(2)(B)(ii); *Estrada–Martinez v. Lynch*, 809 F.3d 886, 893–94 (7th Cir. 2015).

■ The central question in Fuller's petition for review is whether the IJ, seconded by the BIA, permissibly determined that Fuller is not bisexual. This is a factual question, and thus our review of the matter is constrained by the deferential standard of review we just mentioned. We may grant the petition only if we can conclude confidently that substantial evidence does not support the IJ's adverse credibility determination. See *Tawuo v. Lynch*, 799 F.3d 725, 727 (7th Cir. 2015). Our dissenting colleague, taking a fresh look at the evidence, believes that the IJ erred. We cannot rule out that possibility, but that is not the right question to ask. The question instead is whether the facts compel a conclusion contrary to the one that the IJ reached. While we might wish it were otherwise, there is no exception under which plenary review is available for factual questions of enormous consequence, as this one is for Fuller.

As we noted earlier, even though some of the IJ's reasons for disbelieving Fuller

on this central point were mistaken (and if that had been all she said, we would have granted this petition), others were sound. The IJ properly highlighted her concerns with Fuller's inability to recall significant details of the Ocho Rios shooting, which seemed to be the most serious episode in which he claimed to have experienced harm based on his sexual orientation. See *Toure v. Holder*, 624 F.3d 422, 429 (7th Cir. 2010). The IJ was also concerned that Fuller had testified inconsistently when he frequently confused his sisters' names, called his sister his mother, and misstated how many sisters he had. The judge was not required to accept Fuller's excuse that he had made a "mistake" about such basic facts. See *Zeqiri v. Mukasey*, 529 F.3d 364, 371 (7th Cir. 2008). Also, like the IJ, we are disturbed by Fuller's misrepresentation on his 2001 immigration application. See *Keirkhavash v. Holder*, 779 F.3d 440, 442 (7th Cir. 2015). Finally, the IJ adequately explained why she did not credit the letters Fuller submitted or his account of how he obtained them. We conclude that substantial evidence supports the IJ's conclusion that Fuller did not credibly establish that he is bisexual. See *Arrazabal v. Lynch*, 822 F.3d 961, 964–65 (7th Cir. 2016). Because we cannot say that any reasonable adjudicator would be compelled to conclude to the contrary (*i.e.* compelled to conclude that he is indeed bisexual), the agency properly denied Fuller's application for deferral of removal under the CAT. See *Krishnapillai v. Holder*, 563 F.3d 606, 621 (7th Cir. 2009).

■ We are not insensible to the fact that immigration judges sometimes make mistakes, and that the costs of such errors can be terrible. A mistaken denial of asylum can be fatal to the person sent back to a country where persecution on account of a protected characteristic occurs; a mistaken denial of deferral of removal under the

Torture Convention can have ghastly consequences. If we could balance the magnitude of the risk times the probability of its occurrence against the cost of offering a few additional procedures, or a few more years, in the United States, we would. Although this is thin comfort, we note as well that if Fuller is able to gather new evidence showing that the IJ was mistaken about his sexual orientation, it is still possible for him to ask the IJ to accept, *sua sponte,* an untimely motion to reopen. See 8 C.F.R. § 1003.23(b)(1) ("An Immigration Judge may upon his or her own motion at any time, or upon motion of the Service or the alien, reopen or reconsider any case in which he or she has made a decision, unless jurisdiction is vested with the Board of Immigration Appeals."). The IJ's decision on such a request is discretionary and unreviewable, see *Pilch v. Ashcroft,* 353 F.3d 585, 586 (7th Cir. 2003); *Calle-Vujiles v. Ashcroft,* 320 F.3d 472, 474 (3d Cir. 2003) (collecting authority). But if a petitioner's showing were strong enough, the IJ or the Board has the authority to act.

We DENY the petition for review.

Posner, Circuit Judge, dissenting.

The majority opinion upholds the denial of relief to Ray Fuller, a Jamaican citizen who seeks relief against removal to Jamaica. His ground for relief is that in Jamaica he would face a likelihood of persecution and torture because he is bisexual. The merit of his claim depends on how two issues are resolved: whether Fuller is bisexual and whether bisexuals are persecuted in Jamaica. The rejection of the second point by the Immigration Judge, upheld by the Board of Immigration Appeals, is cursory and unconvincing; but if he isn't bisexual the error is harmless. But the rejection of his claim to be bisexual is also unconvincing. The immigration judge emphasized such things as Fuller's lack of detailed recollection of events that go back as far as 1983 and a supposed lack of

"proof" of bisexuality. Well, even members of this panel have forgotten a lot of 33-year-old details. And how exactly does one *prove* that he (or she) is bisexual? Persuade all one's male sex partners to testify, to write letters, etc.? No, because most Jamaican homosexuals are not going to go public with their homosexuality given the vicious Jamaican discrimination against lesbian, gay, bisexual, and transgender ("LGBT") persons, which is undeniable, as I'll show.

Fuller testified before the immigration judge at length and in detail about his being bisexual and having had numerous sexual relationships with both men and women beginning when he was a pre-teen, and about the hatred directed against LGBT persons in Jamaica, including by members of his own family. He testified that in college he was stoned by other students on several occasions and a few years later taunted as gay by a group of men who sliced his face with a knife. On another occasion he was robbed at gunpoint by a man who called him a "batty man," which is a Jamaican slur for a homosexual. And he didn't make that up: see "Batty boy," *Wikipedia,* https://en. wikipedia.org/wiki/Batty_boy (last visited Aug. 17, 2016, as were the other websites in this opinion), where we learn that "in 2006 *Time Magazine* claimed that Jamaica was the worst place in the Americas for LGBT people and one of the most homophobic places in the world." Sex between men is punishable with up to ten years in jail. Certain Jamaican music, which features hostility to homosexuals, such as in a T.O.K. song 'Chi Chi Man' which threatens to burn fire on gays and those in their company, employs the term 'batty boy' to disparage LGBT people. One notorious song, 'Boom Bye Bye' written by dancehall musician Buju Banton, advocates violence against *batty boys,* including shooting them in the head and setting them on fire:

*"Boom bye bye, in a batty bwoy head/Rude boy nah promote no nasty man, dem hafi dead.'"* Our State Department's Human Rights Reports for 2012 and 2013 confirm the *Wikipedia* entry, as do a report by Amnesty International and a decision by another federal court of appeals: *Bromfield v. Mukasey*, 543 F.3d 1071, 1076–77 (9th Cir. 2008). The immigration judge's opinion is oblivious to these facts.

Instead she fastened on what are unquestionable, but trivial and indeed irrelevant, mistakes or falsehoods in Fuller's testimony, for example that he "confused his sisters' names, mixed up a sister with his mother, and gave different figures for the number of sisters that he had." What this has to do with his sexual proclivities eludes me. The fact that an applicant for asylum makes mistakes or even lies is material to his asylum claim only if the mistakes or lies are germane—which the mistakes (or lies) about his sisters and mothers were not. He testified without contradiction that his family has rejected him because of his bisexuality; it would be no surprise if, having been rejected by his mother and sisters, he lashed back at them, as by "mixing up" one of his sisters with his mother. But the important point is the irrelevance of his confusing his family relations, leaving me deeply puzzled about the statement in the majority opinion that "we share the IJ's concerns that Fuller had testified inconsistently when he frequently confused his sisters' names, called his sister his mother, and misstated how many sisters he had." The majority opinion does not explain how this inconsistency could have any bearing on the question of Fuller's sexual orientation.

The immigration judge refused to believe the seven letters from Fuller's children and friends attesting to his bisexuality. The ground of the refusal was that none of the letter writers—including two ex-boyfriends, living in California and Wisconsin respectively—was available to testify in court and that several letters were stylistically suspicious because they all had been signed "on a signature line made on a series of dots." There is no explanation of why this should be considered suspicious, since while a signature line is often an unbroken straight line it is sometimes composed of dots or dashes instead. And there is no showing that the ex-boyfriends' unavailability to testify was attributable to Fuller's fearing they wouldn't help his case.

An incident in which Fuller had been shot in Jamaica because of his being a batty man or batty boy was mentioned in a letter stating that he'd been shot not just on that occasion but on multiple occasions, contrary to his testimony that he'd been shot only once. The immigration judge did not indicate the significance of how many times he'd been shot; and if there was exaggeration it was not by Fuller, whose incentive would be to exaggerate the violence visited on him in Jamaica yet instead rejected the exaggeration. The number of times he'd been shot could not be thought to have undermined his evidence that he is bisexual, when his own testimony minimized that number. It is true that Fuller changed his position on the date of the shooting—in his written statement he said it took place while he was in college, which he attended from 1983 to 1988, but in oral testimony he said it took place in 1996. He may have misremembered, or for some personal reason have wanted to change the date—what could the change have to do with whether he is bisexual?

An obvious thing for the judge to have done in an attempt to sort truth from falsity in Fuller's testimony and the other evidence would have been to ask a psychologist to testify about the credibility of Fuller's claim to be bisexual. Immigration judges are authorized to do this—author-

ized to select and consult, which they may and usually do on the phone, an expert with expertise relevant to the case at hand.

Nor has any reason been given, either by the immigration judge or by the majority opinion in this court, why if Fuller is not bisexual he would claim to be in an effort to remain in the United States, knowing that if he failed in his effort to remain he would be in grave danger of persecution when having lost his case he was shipped off to Jamaica. No doubt once back in Jamaica he could deny being bisexual—but no one who was either familiar with this litigation, or had been one of his persecutors before he left Jamaica for the United States, would believe (or at least admit to believing) his denial.

There is still another wrinkle to the case ignored by the immigration judge, and that is that homosexuals often are antipathetic to bisexuals. See, e.g., San Francisco Human Rights Commission: LGBT Advisory Committee, *Bisexual Invisibility: Impacts and Recommendations* (2011), www.lgbtqnation.com/assets/2011/03/bi-invisibility.pdf; "Why Do Gays Hate Bisexuals?" *Answers.com*, www.answers.com/Q/Why_do_Gays_hate_Bisexuals; "What Gay Men Think About Bisexuals," *YouTube*, www.youtube.com/watch?v=XUXzNowXVwo. This is not to say that they would be likely to attack Fuller physically when he returned to Jamaica, but they might well talk about his return to the island—the return of a bisexual—and some of the persons to whom they talked might well be heterosexual and want to harm Fuller physically. Word is likely to spread quickly in an island of fewer than three million inhabitants.

The weakest part of the immigration judge's opinion is its conclusion that Fuller is not bisexual, a conclusion premised on the fact that he's had sexual relations with women (including a marriage). Apparently the immigration judge does not know the

meaning of *bisexual*. The fact that she refused even to believe there is hostility to bisexuals in Jamaica suggests a closed mind and gravely undermines her critical finding that Fuller is not bisexual.