MARTIN, Circuit Judge,
concurring:
At every stage of his case, Mr, Arguelles told U.S. authorities that if he were returned to Venezuela he would be imprisoned and likely tortured on account of his role in political protests there during 2002. The government repeatedly rejected his claims. Turns out, Mr. Arguelles was right. When he was removed to Venezuela, Mr. Arguelles was met at the airport by Venezuelan authorities who took him directly to prison. In that prison, he is allowed to see the sun only one hour per week and there is no water safe for him to drink. The majority opinion correctly sets out our Circuit precedent as well as the authority given us by statute to review Mr. Arg-uelles’s case. Based on that precedent and our limited authority, the majority properly concludes that we must affirm the government’s decisions.
I write separately, however, to detail some of the evidence Mr. Arguelles submitted in his effort to receive protection under the Convention Against Torture (“CAT”) and to explain why I view this evidence as sufficient to have warranted CAT protection for Mr. Arguelles. This case also compels me to critique the burden placed on a person seeking CAT protection. Finally, I describe the appalling conditions of confinement in which Mr. Arguelles now finds himself in Venezuela, and how this irreparable harm to Mr. Arg-uelles could have and should have been avoided.
I. MR. ARGUELLES’S CLAIM UNDER THE CAT
A. EVIDENCE FOR THE CAT CLAIM
In his 2014 application for asylum and withholding of removal, Mr. Arguelles wrote that he feared he would be “incarcerated and' tortured by [ ] Maduro’s government for [his] outspoken political opposition because [he is] a member of the Air Force and [ ] participat[ed] . in peaceful protest.” In his pretrial statement before the Immigration Judge (“U”), Mr. Arg-uelles explained that after participating in *711 peaceful protests against the Chavez government for more than a year, he “had to remain in semi-hiding” as his “[fjellow military colleagues were imprisoned” or “went into exile.” He was eventually subpoenaed to be served with formal criminal charges and left Venezuela to avoid arrest. In 2004, the United States granted him asylum from the Chavez regime. Also in his pretrial statement seeking to avoid removal, Mr. Arguelles said Venezuela’s new government continues to arrest peaceful protestors. He argued that the Venezuelan government practices torture. In that regard, he highlighted the torture of a judge in 2009 as well as a 2013 Human Rights Report on Venezuela written by the U.S. Department of State that discussed torture and life-threatening conditions in Venezuelan prisons.
Mr. Arguelles filed four exhibit packages containing dozens of reports and articles on Mr. Arguelles’s story, the conditions in Venezuela, and Venezuela’s treatment of peaceful protestors. Included among these exhibits was the 2013 Human Rights Report on Venezuela, which listed human rights problems such as “summary killings by police elements; torture and other cruel, inhumane, or degrading treatment; harsh and life-threatening prison conditions and lack of due process rights that contributed to widespread violence, riots, injuries, and deaths in prisons.” The exhibits also included a 2014 statement by John Kerry, the U.S. Secretary of State, expressing concern over the Venezuelan government’s confrontation with peaceful protestors and calling for the release of members of the opposition who had been jailed. The package contained Mr. Arg-uelles’s arrest warrant from 2004 for the crimes of “Conspiracy, Civil Rebellion, and Instigation of Insurrection.”
Also among Mr. Arguelles’s exhibits was the affidavit of Dr. Bruce Bagley, an expert, who said Venezuela’s current President, Nicolas Maduro, “has continued to jail opposition figures” and “[tjorture- occurs routinely in Venezuela’s jails and prisons.” Dr. Bagley further explained:
Anyone who participated in the 2002 [ ] protest movement is now either in jail or in exile. President Chavez did not take action immediately against the peaceful [ ] protesters. Instead, he initially adopted a rhetorical policy of “reconciliation.” Within a year, however, he began systematically to round up, arrest and jail military personnel who had [ ] participated ... in the [ ] protests.
Dr. Bagley testified that torture exists in Venezuela today and President Maduro “has resorted to systematic torture in order to dissuade or repress the opposition.” His testimony continued that “people who are returned to Venezuela and who are associated with dissident movements within the Venezuelan military, especially the suspect air force, which .,. was not a close follower of Chavez ... would be subjected [] to harsh and abusive treatment, probably torture, and they could easily end his life.” He also stated that -President Maduro was “hand-picked by President Chavez” to continue Chavez’s professed “Bolivarian Revolution” and that conditions in Venezuela have worsened during Maduro’s presidency.
Mr. Arguelles’s wife is an American citizen. With her he has two American-born children. At the time of his hearing before the IJ, his children were ages six and four. In response to how his removal to Venezuela would affect his family, Mr. Arg-uelles answered he would “be first in prison, then tortured, then killed,” and anyone who “has lost a family member knows what it feels [sic].” Mr. Arguelles expressed his belief that his fellow protestors *712 who had been jailed were also tortured. He also said he left Venezuela “following [his] lawyer’s advice, that [he] was going to be imprisoned, tortured, and maybe killed.” In response to why the Venezuelan government would be aware of him after his long absence, Mr. Arguelles explained that the air force is the biggest threat to the government and the government would punish him to send a message to the armed forces. Mr. Arguelles testified that President Chavez spent almost an hour on a government television station insulting Mr. Arguelles after his arrest in the United States in 2012.
As the majority has recounted, the IJ and BIA rejected Mr. Arguelles’s petition. He next filed a motion asking the BIA to reopen his appeal on the ground that if he were returned to Venezuela, he would be immediately detained and more likely than not tortured. Mr. Arguelles presented a newly discovered 2009 arrest warrant listing “no crime indicated” as the explanation for his arrest. In explaining his delay in producing this arrest warrant, Mr. Arg-uelles submitted an affidavit from his sister detailing that this arrest warrant was not publicly available in Venezuela. Her affidavit also explained the risk of seeking out this warrant from those who don’t want it made public. Mr. Arguelles included articles about Venezuela published since his first submission of exhibits to the IJ. Among those articles was the U.S. Department of State’s 2014 Human Rights Report for Venezuela, which again noted reports of torture.
B. THE IJ AND BIA DENIED CAT PROTECTION
The IJ explained that to receive CAT protection Mr. Arguelles was required to “show that it is more likely than not that he [ ] will be singled out for torture by a public official acting in his or her official capacity or at the instigation or with the acquiescence of such an official.” The IJ found that Mr. Arguelles had not met his burden under this “more likely than not” standard.
For Mr. Arguelles’s case, the IJ found that “a pattern of human rights violations alone is not sufficient” and that Mr. Arg-uelles had not demonstrated he “will be personally at risk of torture.” The IJ discounted Mr. Arguelles’s fear of imprisonment and the Human Rights Report’s “grim picture of Venezuela’s prison system” because, again, the IJ felt Mr. Arg-uelles failed to show he would be singled out for torture in prison. The IJ treated Dr. Bagley’s testimony in much the same way. He discounted Dr. Bagley’s testimony that torture routinely occurs in Venezuelan prisons, because Dr. Bagley did not testify specifically that those imprisoned for the 2002 protests were singled out for torture or were “subjected to harm greater than what any prisoner in Venezuela experiences.” On this record, the IJ found “[t]here is no evidence that torture is used in Venezuelan prisons as a matter of policy or that the deliberate infliction of torture is widespread and pervasive.”
The IJ also distinguished Mr. Arguelles from known Venezuelan torture victims, saying those victims had been targeted for their involvement in coups or their participation in more recent 2014 protests. He even distinguished one torture victim because he had been tortured under the Chavez regime and not the Maduro regime. The IJ concluded:
There is no indication in the record that a participant in the 2002 protests ... who returns to Venezuela 13 years after the protests, will more likely than not be tortured. [Mr. Arguellesjs evidence speaks to general violence and political repression in Venezuela, not to specific instances where identified individuals *713 like [Mr. Arguelles] were recently subjected to treatment that constitutes torture.
The BIA, reviewing the same record, agreed with the IJ. The BIA ruled “[t]here is insufficient evidence in the record that torture is used in Venezuelan prisons as a matter of policy or that it is widespread and pervasive.” It decided Mr. Arguelles “did not establish that a participant in the 2002 protests, who returned to Venezuela 13 years later, will more likely than not be tortured.” Instead, it determined Mr. Arg-uelles’s fears were “speculative.” The BIA concluded Mr. Arguelles “did not establish that it is more likely than not that he would be tortured.”
The BIA also denied Mr. Arguelles’s motion to reopen based on new evidence because it was “not persuaded that this limited evidence of an additional ‘no crime indicated’ charge has been shown to satisfy the respondent’s heavy burden of demonstrating that it would likely change the result in this case.”
C. THE RECORD DOES NOT COMPEL REVERSING THE BIA
Sitting as the IJ or on the BIA, I would have granted Mr. Arguelles’s CAT claim. I view Mr. Arguelles’s evidence as sufficient to have met his burden under the CAT. To begin, his record had already been the basis for the United States’ grant of asylum to Mr. Arguelles in 2004. His evidence at that time included a pending arrest warrant from 2004. Mr. Arguelles has since also offered expert testimony about the efforts of the Maduro government to closely follow in President Chavez’s footsteps, including torture of opponents of the Chavez regime, with a particular wariness for dissidents from the air force. Mr. Arg-uelles provided credible reports of torture and life-threatening prison conditions. He also testified that, as recently as 2012,. President Chavez disparaged him on government television. This evidence suggested the current Venezuelan government intended to punish Mr. Arguelles if it could get its hands on him, and that torture was a regular form of punishment for political prisoners in Venezuela. Had I been a part of the immigration adjudication process, I would have also granted Mr. Arguelles’s motion to reopen. The evidence I’ve described, together with the 2009 warrant, issued after Mr. Arguelles had been out of the country for 5 years, confirmed the Venezuelan government’s continued interest in imprisoning and punishing Mr. Arg-uelles, with torture as a likely option.
However, our Circuit precedent gives us a very limited role in reviewing BIA decisions. See Rodriguez Morales v. U.S. Att’y Gen., 488 F.3d 884, 890 (11th Cir. 2007) (per curiam) (“To reverse the BIA’s fact findings, this Court must find that the record not only supports reversal, but compels it.” (alterations adopted and quotation omitted)); Najjar v. Ashcroft, 257 F.3d 1262, 1278 (11th Cir. 2001) (“It is axiomatic that immigration courts are better suited than a reviewing court to make factual determinations regarding an alien’s status. Courts of appeal sit as reviewing bodies to engage in highly deferential review of BIA and IJ determinations.”). The standard of review set by our Court requires us to decide whether the record from the BIA proceeding compels a finding that it is more likely than not that Mr. Arguelles would be tortured by the Venezuelan government. See Rodriguez Morales, 488 F.3d at 890, And we review a motion to reopen under an even more deferential abuse of discretion standard. Butalova v. U.S. Att’y Gen., 768 F.3d 1179, 1182 (11th Cir. 2014) (per curiam). I cannot say the record “compels” reversing the BIA or holding that the BIA abused its discretion in denying the motion to reopen. *714 This is despite my own belief that Mr. Arguelles demonstrated it was more likely than not that he would be tortured. Through our deferential standard of review, this Court gives the BIA a wide berth. We must therefore rely on the BIA to make the right decisions.[1] I say there was plenty in this record to indicate the wisdom of deciding this case in Mr. Arg-uelles’s favor.
II. “MORE LIKELY THAN NOT”
Mr. Arguelles’s case also demonstrates the problems presented by the burden of proof placed on petitioners seeking CAT protection. In order to have his removal deferred under the CAT, a petitioner must prove to the government that it “is more likely than not” he will be tortured. 8 C.F.R. § 208.17. But this standard is not found in the CAT. Instead the CAT forbids a party to the treaty from returning “a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture.”[2] Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment art. 3, Dec. 10, 1984, 108 Stat. 382, 1465 U.N.T.S. 85. The Seventh Circuit recently observed “that the ‘more likely than not’ standard artieu-lated in many CAT opinions cannot be and is not taken literally.” Gutierrez v. Lynch, 834 F.3d 800, 806 (7th Cir. 2016) (quotation omitted). Instead, that court articulated the proper inquiry to be: whether “there is, or is not, a substantial risk that a given alien will be tortured if removed from the United States.” Rodriguez-Molinero v. Lynch, 808 F.3d 1134, 1136 (7th Cir. 2015). I view the Seventh Circuit’s formulation of this standard as better reflecting the language of the CAT as well as the FARR Act.
Indeed the “more likely than not” standard does more than stray from the language of the CAT and the FARR Act. It also suggests to IJs and the BIA, wrongly I think, a sense that they can and must predict a petitioner’s risk of being tortured once removed. But my experience tells me that courts cannot be expected to meaningfully discern, for example, between a 51% and a 49% likelihood of torture. See Arrazabal v. Lynch, 822 F.3d 961, 966 (7th Cir. 2016) (“[T]hat oft-repeated phrase [‘more likely than not’] must be understood pragmatically in the immigration context, because there is no reliable data to show just how great an applicant’s risk of torture is.”). This “more likely than not” standard has resulted in IJs demanding an impossi *715 ble level of proof on torture' claims. For example for Mr. Arguelles, both the IJ[3] and the BIA[4] required him to show that someone identical to him-r-a wanted political refugee returning to Venezuela more than thirteen years after he partook in peaceful protests—would more likely than not be tortured. I am not aware of any other court that mandates this level of proof from its litigants. Mr. Arguelles’s exact circumstance has almost certainly never been duplicated, but there is nothing in the CAT that excludes him from getting relief for that reason. There is a false sense emanating from the government’s standard that the future can only hold precise replications of the past. Sadly,.this led the IJ and BIA to ignore the obvious and substantial risk that Mr. Arguelles would be tortured once he was removed to Venezuela. Said another way, this led them to get Mr. Arguelles’s case tragically wrong. • •
III. THE GOVERNMENT MADE NO EFFORT TO PREVENT IRREPARABLE HARM TO MR. ARGUELLES
As is its right, the government removed Mr. Arguelles while his appeal was pending. A different panel of this Court denied Mr. Arguelles’s emergency motion to stay removal and motion for reconsideration. He was removed to Venezuela immediately. Two Department of Homeland Security officials accompanied Mr. Arguelles to Venezuela right before Christmas and handed him over to Venezuelan officials at the airport. Mr. Arguelles provided us with an affidavit from his lawyers in Venezuela explaining what has happened to him since. The government of Venezuela is prosecuting- Mr. Arguelles for conspiracy, civil rebellion, and incitement to insurrection. He is imprisoned in a small basement cell with no natural light and permitted outside for just one hour per week. He is not .allowed to have .anything with him, including a watch or clock, (so as to know the time of day), nor books, TV, or a radio to pass the time. Mr. Arguelles is only permitted access to his lawyers by phone, and then for only up to one hour per week. There is no potable water. Instead his parents, who are almost eighty years old, must endure a humiliating body search that includes stripping naked, jumping, and bending over just to bring him water. We do not know what will happen to Mr. ■ Arguelles when they can no longer visit.
We are barred by statute from considering this new evidence in reviewing the BIA decision. 8 U.S.C. § 1252(b)(4)(A); see Najjar, 257 F.3d at 1278. Neither can we remand this case to the BIA to hear new evidence. 8 U.S.C. § 1252(a)(1). Also, Mr. Arguelles cannot file a motion to reopen now that he has been removed. 8 C.F.R. § 1003.2(d).[5]
On the, other hand, the BIA has the authority to reopen or reconsider any of its decisions on its own motion. ,8 C.F.R. § 1003.2(a). Instead .of considering this new evidence, the government told us repeatedly during oral argument that if Mr. Arguelles .could now just somehow arrive at the United States border he could again apply for CAT protection. Given the government’s role in Mr. Arguelles’s current confinement, its straight-faced suggestion *716 that he is welcome to stroll up to United States’ border and again ask for help was not well received.
The government does rightly acknowledge that there is nothing anyone here could do for Mr. Arguelles while he is detained in Venezuela even if he were to now win his appeal. Yet, when responding to Mr. Arguelles’s motions to stay removal in this Court, the government chose not to engage with his claims of irreparable harm, despite recognizing irreparable harm as a “most critical” factor in the stay analysis. See Nken v. Holder, 556 U.S. 418, 484, 129 S.Ct. 1749, 1761, 173 L.Ed.2d 550 (2009). It is true that in Nken, the Supreme Court told us removal from the United States is not categorically irreparable because removed petitioners “who prevail can be afforded effective relief by facilitation of their return.” Id. at 435, 129 S.Ct. at 1761. But I say it is implicit in this rule that removal does constitute irreparable harm when facilitation of a removed petitioner’s return will not be possible. Courts must, by their nature, rely on the expertise and discretion of the executive branch of government, and trust it to evaluate whether facilitation of return will be possible after removal. Here, the government flew Mr. Arguelles to Venezuela and affirmatively handed him over to Venezuelan authorities before this Court could hear his appeal. Nothing in the record before us indicates any effort was made to ensure that immigration authorities would be able to facilitate Mr. Arguelles’s return if he were to win his appeal.
Considered one-by-one, each decision the government made about Mr. Arguelles is defensible. Yet the sum of these decisions resulted in what I view as our country’s failure to live up to its duties under the CAT. My hope is that Mr. Arguelles’s case can help us avoid this type of failure in the future. My regret is that he finds himself in the position of having to teach us this lesson.

. The CAT was implemented by Congress through the Foreign Affairs Reform and Restructuring Act of 1998, Pub. L. No. 105-277, § 2242, 112 Stat. 2681, 2681-822, ("FARR Act") codified as a note to 8 U.S.C. § 1231:
It shall be the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture, regardless of whether the person is physically present in the United States.
Id,; see Reyes-Sanchez v. U.S. Att'y Gen„ 369 F.3d 1239, 1240 n.l (11th Cir. 2004).

. "There is no indication in the record that a participant in the 2002 protests ... who returns to Venezuela 13 years after the protests, will more likely than not be tortured.”

. Mr. Arguelles "did not establish that a participant in the 2002 protests, who returned to Venezuela 13 years later, will more likely than not be tortured.”

.There are also other reasons Mr. Arguelles cannot file another motion to reopen but it is not important to detail them here. See, e.g.. 8 C.F.R. § 1003.2(c)(2).