In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 15-1860

HAIR RODRIGUEZ-MOLINERO,

*Petitioner,*

*v.*

LORETTA E. LYNCH, Attorney General of the United States,

*Respondent.*

---

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A075-614-869

---

ARGUED NOVEMBER 18, 2015 — DECIDED DECEMBER 17, 2015

---

Before POSNER, MANION, and SYKES, *Circuit Judges.*

POSNER, *Circuit Judge.* Rodriguez-Molinero seeks deferral of removal to Mexico on the ground that he will be tortured if forced to return there. The Convention Against Torture, an international convention to which the United States is a party, forbids the return of "a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture." Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment

or Punishment, Dec. 10, 1984, Senate Treaty Doc. No. 100–20, p. 20, 1465 U.N.T.S. 85, Art. 3(1). A federal regulation states that "an alien who: has been ordered removed; has been found … to be entitled to protection under the Convention Against Torture; and is subject to the provisions for mandatory denial of withholding of removal … shall be granted deferral of removal to the country where he or she is *more likely than not* to be tortured." 8 C.F.R. § 1208.17(a) (emphasis added). The phrase we've italicized, though repeated in numerous opinions, see, e.g., *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987); *Milosevic v. INS*, 18 F.3d 366, 372 (7th Cir. 1994), cannot be and is not taken literally, and this for several reasons: It would contradict the Convention (which as noted above requires only "substantial grounds for believing that" if removed the alien "would be *in danger* of being" tortured). It would dictate that while an alien who had a 50.1 percent probability of being tortured in the country to which he had been ordered removed would be granted deferral of removal, an otherwise identical alien who had "only" a 49.9 percent probability of being tortured would be removed—an absurd distinction. And it is not enforceable. The data and statistical methodology that would enable a percentage to be attached to a risk of torture simply do not exist. All that can be said responsibly on the basis of actually obtainable information is that there is, or is not, a substantial risk that a given alien will be tortured if removed from the United States. As we pointed out in *Yi-Tu Lian v. Ashcroft*, 379 F.3d 457, 461 (7th Cir. 2004): "How one translates all this vague information into a probability that [the alien, if removed] will be tortured (remember the test is 'more likely than not') is a puzzler. Maybe probability is the wrong lens through which to view the problem. 'More likely than not' is the standard

burden of proof in civil cases (the 'preponderance' standard) and rarely is the trier of fact asked to translate it into a probability (i.e., more than 50 percent). Maybe some strong suspicion that [the alien] is at risk of being tortured if he is [removed] … would persuade the immigration authorities to let him stay." (We should note—it relates to this case—that "torture" as defined in the Convention Against Torture as well as in the regulations includes killing whether or not accompanied by other torture—and it is indeed death as well as torture that the petitioner in this case fears. See 1465 U.N.T.S. 85, Art. 1(1), defining torture to include "any act by which severe pain or suffering … is intentionally inflicted," and 8 C.F.R. § 1208.18(a)(4)(iii), including "the threat [and *a fortiori* the actuality] of imminent death.")

Rodriguez-Molinero is a Mexican citizen in his mid-thirties who has lived in the United States for many years as a lawful permanent resident. He got involved in the methamphetamine trade and this led to his conviction of federal drug crimes and to a prison sentence that he has now served. But he remains detained in the custody of the Department of Homeland Security, and as an alien convicted of an aggravated felony consisting of trafficking in controlled substances, he is subject to being removed to Mexico. See 8 U.S.C. §§ 1227(a)(2)(A)(iii), 1101(a)(43)(B). He seeks deferral of removal on the ground that should he be sent back to Mexico he is highly likely to be tortured by the Zetas, a violent Mexican drug cartel. Sylvia Longmire, the petitioner's expert witness and a respected student of Mexico's drug wars, stated in a report credited by the immigration judge that in 2012 the Zetas killed 49 people and dumped their bodies on a highway near Monterrey—a typical, not an isolated, atrocity committed by the gang.

And why is Rodriguez-Molinero in danger from the Zetas? During several trips to Mexico between 2005 and 2007 he bought meth from the Zetas for resale in the United States and on one of those trips, in 2006, he was tortured by Mexican police, who entered his hotel room, burned him with cigarettes, beat him, and stabbed him with an ice pick. This was done at the behest of a member of the cartel known to the petitioner only as Jose. The torture was intended, Jose explained to the petitioner, to test his loyalty to the cartel. The immigration judge concluded that "the unfortunate beating and cigarette burns he experienced amount to torture," and we agree.

When the petitioner returned to the United States after his last trip to Mexico, he owed the gang an estimated $30,000 for meth that he had bought from Jose on credit; he has never repaid the debt. And when arrested upon his return with a substantial amount of meth that he had intended to sell in the United States, he reported his experiences with the Zetas to both the FBI and the DEA. As a deadbeat and informer, he is, Longmire stated, "marked for death." The Zetas may not know that he has informed against them, but they have only to read the opinions of the immigration judge and the Board of Immigration Appeals to discover it.

The Mexican drug cartels, expert witness Longmire explained, "have long memories and do not easily let transgressions go without some sort of punishment or retribution, even years after they're committed. By 'forgiving and forgetting,' it makes these organizations look weak and [this] implies they don't always follow through with their threats." She added that the cartels have "network[s] of employees and paid police and government officials" throughout Mexi-

co and that "it is difficult for [her] to envision a scenario where [the petitioner] would not be tortured and killed for both owing Jose a drug debt of $30,000 and working with the DEA against Los Zetas. … Due to corruption-induced short-comings and a general unwillingness to assist, neither the Mexican government nor Mexican law enforcement would be able to adequately protect" the petitioner if he were to return to Mexico. She detailed hundreds of deaths attributable to the Zetas in Mexico between 2010 and 2012, adding that "Los Zetas have taken a disturbing turn for the worse in the last few years."

The government waived cross-examination of Longmire, thus leaving unchallenged her testimony concerning the brutality of the Mexican drug gangs and the complicity, corruption, and incompetence of the Mexican police. The cartel's ferocity and the helplessness of the Mexican government to curb it is legendary, as Longmire observed and as detailed in other reports and articles submitted in Rodriguez-Molinero's immigration proceeding. See, e.g., George W. Grayson & Samuel Logan, *The Executioner's Men: Los Zetas, Rogue Soldiers, Criminal Entrepreneurs, and the Shadow State They Created* (2012); Ted Galen Carpenter, "Corruption, Drug Cartels and the Mexican Police," *National Interest*, September 4, 2012, http://nationalinterest.org/commentary/corruption-drug-cartels-the-mexican-police-7422 (visited December 15, 2015, as were the other websites cited in this opinion); Michael Evans & Jesse Franzblau, eds., "Mexico's San Fernando Massacres: A Declassified History," *The National Security Archive*, November 6, 2013, http://nsarchive.gwu.edu/NSAEBB/NSAEBB445/.

After Rodriguez-Molinero returned to the United States, members of the Zetas cartel kidnapped and murdered his great-uncle after visiting the great-uncle's house several times asking for information about his grand-nephew—Rodriguez-Molinero. According to the great-uncle's widow, police officers "took [the great-uncle] in a patrol car [and] days later they found him dead[,] unrecognizable [and] days later we found out that it was a kidnap[p]ing and that they [had] tortured him to death[.] [S]ome days passed and some men arrived asking for Hair [the petitioner] and it has been several times now that they come to ask for him." In another letter the widow said she "still continue[s] to receive calls from the infamous Zetas asking for [the petitioner]." The petitioner's mother has said that while her uncle (the petitioner's great-uncle) was being held by his kidnappers before they killed him, a man had called and "identified himself as a member of Los Zetas" and "said that if they did not get information about [the petitioner] that my uncle was going to pay the consequences." They did not get the information and he did pay the consequences—with his life.

The petitioner submitted in his removal proceeding an article describing a brutal beheading committed by members of the Zetas after the victim posted information about the cartel on an online discussion board. The U.S. State Department has chimed in on the Mexican drug gangs in its annual human rights report, which estimates that 26,121 persons disappeared in Mexico between 2006 and 2012, and most are believed to have been kidnapped by criminal organizations like the Zetas. U.S. Department of State, Bureau of Democracy, Human Rights & Labor, "Mexico 2013 Human Rights Report," *Country Reports On Human Rights Practices for 2013* 109 (2013).

Surprisingly in light of the evidence we've just summarized, the immigration judge ruled that the petitioner had failed to show that he faced a substantial risk of torture were he to be removed to Mexico, or if that happened and he was tortured that the Mexican government would acquiesce in the torture. The immigration judge reached this conclusion despite finding that the petitioner's testimony was "largely consistent with the documents in the record regarding dangerous country conditions in Honduras [she meant to say Mexico]" and "that the respondent's fear of returning to Honduras [again she meant Mexico] [was] credible." She suggested that Jose must have lost interest in the petitioner, whom he hadn't seen in seven years (it is now eight years since Jose and the petitioner last met). But that was a period in which the petitioner was in the United States in prison and Jose was in Mexico; one could hardly expect Jose to visit the petitioner in an American prison.

We don't understand the immigration judge's suggestion that the petitioner should be reassured by the fact that the great-uncle's widow hasn't been killed or otherwise harmed by the Zetas "despite having receiv[ed] the threatening call from the Zetas just before her husband was purportedly killed." She *has* been harmed—her husband's brutal murder surely harmed her, albeit not physically. And sinister men, dangerous men, have continued to come to her house looking for the petitioner even after the murder.

And why did the immigration judge say that the great-uncle was only "purported" to have been killed? His dead body was found mutilated and his death certificate was submitted as evidence during the immigration proceeding; wasn't that evidence enough that he'd been murdered?

"In sum," the immigration judge said, the petitioner "did not demonstrate that Jose or the Zetas are likely to torture him if he returns to Mexico" and even if he would be tortured upon his return he "did not demonstrate that the Mexican government will inflict or acquiesce in torture of the [petitioner] by Jose and/or the Zetas, a group of private actors"—this despite her crediting the petitioner's evidence concerning local government officials' complicity by remarking that "country conditions documents and Ms. Longmire's affidavit do indicate that Mexico has significan[t] problems with governmental corruption and occasional police brutality."

The immigration judge erred when she said in the passage from her opinion that we've just quoted that to be a ground for deferral of removal the infliction, instigation, consent, or acquiescence in torture must be by the Mexican *government* rather than just by Mexican police officers or other government employees—and so she denied Rodriguez-Molinero's application for deferral of removal because she thought he had "failed to demonstrate that he will more likely than not be tortured by, or with the acquiescence of, government officials if he is removed to Mexico." Not the issue! Torture as a basis for deferral of removal is defined so far as bears on this case as severe pain or suffering "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." 8 C.F.R. § 1208.18(a)(1). The alien need not show that multiple government officials are complicit in order to be entitled to relief. "Acquiescence of a public official requires that *the public official*, prior to the activity constituting torture, have awareness of such activity and thereafter breach *his or her* legal responsibility to intervene to prevent such activity." *Id.*,

§ 1208.18(a)(7) (emphasis added). That Mexican police participate as well as acquiesce in the torture of the petitioner is evidenced by the torture that police have already inflicted on him at Jose's direction, an atrocity consistent with the widespread understanding that many Mexican police are allied with the big drug cartels, such as the Zetas.

Nor is the issue, as the immigration judge opined, whether the police officers who tortured the petitioner "were rogue officers individually compensated by Jose to engage in isolated incidents of retaliatory brutality, rather than evidence of a broader pattern of governmental acquiescence in torture." It is irrelevant whether the police were rogue (in the sense of not serving the interests of the Mexican government) or not. The petitioner did not have to show that the entire Mexican government is complicit in the misconduct of individual police officers.

The immigration judge further compounded her errors by saying that because "the Mexican government has made efforts to prevent violence by drug cartels," it would "not participate in or acquiesce to torture of the" petitioner. Again that is not the issue. That the Mexican government may be trying, though apparently without much success, to prevent police from torturing citizens at the behest of drug gangs is irrelevant to this case. *N.L.A. v. Holder*, 744 F.3d 425, 440–42 (7th Cir. 2014). See also *Madrigal v. Holder*, 716 F.3d 499, 509–10 (9th Cir. 2013), a case involving the Zetas cartel and concluding, as do we, that "if public officials at the state and local level in Mexico would acquiesce in any torture [that the petitioner] is likely to suffer, this satisfies CAT's requirement that a public official acquiesce in the torture, even

if the federal government in Mexico would not similarly acquiesce."

For a sound analysis, we go to *Avendano-Hernandez v. Lynch*, 800 F.3d 1072 (9th Cir. 2015), where we read that "Avendano-Hernandez provided credible testimony that she was severely assaulted by Mexican officials on two separate occasions: first, by uniformed, on-duty police officers, who are … 'public officials' for the purposes of CAT. … The BIA erred by requiring Avendano-Hernandez to also show the 'acquiescence' of the government when her torture was inflicted *by* public officials themselves, as a plain reading of the regulation demonstrates. … We reject the government's attempts to characterize these police … officers as merely rogue or corrupt officials. … Avendano-Hernandez was not required to show acquiescence by a higher level member of the Mexican government … . Thus, the BIA erred by finding that Avendano-Hernandez was not subject to past torture by public officials in Mexico." *Id*. at 1079–80.

The Board of Immigration Appeals, to which Rodriguez-Molinero appealed from the immigration judge's denial of deferral of removal, repeated the same errors, en route to dismissing the appeal, that the immigration judge had committed. The first oddity in the Board member's opinion (as usual the appellate "panel" consisted of just one member of the Board, see *Board of Immigration Appeals Practice Manual*, www.justice.gov/sites/default/files/pages/attachments/2015/10/30/biapracticemanual_fy2016.pdf#page=13 at 3) is the statement that "despite several previous trips to Mexico, [petitioner] now is afraid of returning to his homeland because he owes money to the gang or drug cartel known as the Zetas and because he gave information to United States law

enforcement authorities about this organization." No, it was not *despite* his previous trips to Mexico that he is afraid of being sent back there, but *because* of the previous trips and his involvement with Jose and other Zetas in smuggling drugs into the United States. He provided information about the Zetas to American law enforcement *after* he had returned from his last trip to Mexico in 2007. His situation vis-à-vis the Zetas has changed for the worse since he was last in Mexico.

The Board member also failed to detect the immigration judge's error in finding torture by police officers insufficient for CAT relief, for he remarked that the petitioner had "not demonstrated any error by the Immigration Judge in evaluating the evidence, [or] in applying legal standards." He should have remanded the case to the immigration judge to enable her to correct her errors.

If the Mexican government could be expected to protect the petitioner from the Zetas should he be returned to Mexico, the risk that he would be tortured or killed might be too slight to entitle him to deferral of removal. But the legal team representing our government in this case presented no evidence of this—indeed, it presented no evidence at all. And though the immigration judge remarked that the Mexican government was trying to control the drug gangs, it is success rather than effort that bears on the likelihood of the petitioner's being killed or tortured if removed to Mexico. And finally the government made no effort to refute the expert's testimony that the petitioner could not relocate to a safe part of Mexico—that no part is safe for him—a proposition that neither the immigration judge nor the BIA member challenged.

For all the reasons we have given, we grant the petition for review and remand the case to the Board of Immigration Appeals for further proceedings consistent with this opinion.