In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-2413

FRANCISCO ALBERTO ROMERO ARRAZABAL,

*Petitioner*,

*v.*

LORETTA E. LYNCH, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals
No. A045-091-341

SUBMITTED MARCH 10, 2016[*] — DECIDED MAY 4, 2016

Before WOOD, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

WOOD, *Chief Judge*. Francisco Alberto Romero Arrazabal, a Salvadoran with ties to the Mara Salvatrucha gang, applied for withholding of removal and relief under the U.N. Con-

---

[*] After examining the briefs and record, we have concluded that oral argument is unnecessary. The appeal is therefore ready for disposition. See FED. R. APP. P. 34(a)(2)(C).

vention Against Torture and Other Cruel, Inhuman or De-
grading Treatment or Punishment (the CAT). Arrazabal fears
that if he is returned to El Salvador, he will be persecuted by
his gang, a rival gang, or the police. An immigration judge
found his testimony incredible and denied all relief; the
Board of Immigration Appeals upheld that decision.
Arrazabal filed a timely petition for review, which we grant.

When Arrazabal first entered the United States in 1995 at
the age of 19, he was given the status of a lawful permanent
resident alien, based on the fact that his mother and sister
were naturalized citizens. Within a year, however, he had
become involved with the Los Angeles chapter of the Mara
Salvatrucha gang, known as MS-13, which has members in
both the United States and El Salvador. (It is unclear, though
immaterial at this point, when Arrazabal initially joined the
gang: he told an asylum officer that he joined in 1992 while
still in El Salvador, but he testified before the immigration
judge that he joined in 1996 after his move to the United
States.) Arrazabal's gang association quickly led to run-ins
with the law. He was convicted and imprisoned for one year
in California for illegal gun possession, and then he wound
up back in prison for two years for possessing cocaine, a vio-
lation of his probation. While in prison he obtained several
prominent tattoos identifying him as a member of MS-13.

This criminal activity led in 2001 to the revocation of
Arrazabal's status as a lawful permanent resident alien. He
applied at that time for asylum, but his application was de-
nied and he was removed to El Salvador. About a decade lat-
er, Arrazabal attempted to reenter the United States illegally
near Hidalgo, Texas. He failed: Border Patrol agents caught
him and charged him with being present in the United States

unlawfully after his removal. See 8 U.S.C. § 1326. He pleaded guilty to that offense and received a 27-month sentence.

While his criminal case was pending, Arrazabal learned that the 2001 removal order would be reinstated. See 8 U.S.C. § 1231(a)(5). At this point, he decided to seek asylum. During a credible-fear interview, see 8 C.F.R. § 241.8(e), he told an officer that he feared he would be killed if he were returned to El Salvador. He wanted to quit MS-13, he explained, but his identifying tattoos made him a target for fellow MS-13 members, for rival gangs, and for the Salvadoran police. The asylum officer found that Arrazabal had shown a reasonable probability that he had been tortured in his home country during police beatings in 2008 and 2010 for being a suspected MS-13 member, and that these beatings were sufficient to create a reasonable possibility that he would be tortured if returned there.

Because his 2001 removal order made him ineligible for asylum, Arrazabal then applied for withholding of removal and CAT protection. At a hearing before an immigration judge on his revised application, he testified that after his removal from the United States in 2001, he had tried to earn an honest living as a bricklayer in El Salvador. He was stymied by his tattoos, which exposed him as an MS-13 member and invited harassment from fellow gang members, who wanted him to return to active participation in the gang and extorted weekly $10 payments from him. Arrazabal also described frequent harassment at the hands of the Salvadoran police. They arrested him 30 times without cause, and twice beat him with batons during interrogations. To corroborate these assertions, Arrazabal submitted a number of exhibits, including newspaper articles about gang violence in El Sal-

vador and letters from relatives (his mother, mother-in-law, sister, and uncle) expressing concern that he would be murdered by MS-13 if he were sent back.

The immigration judge denied Arrazabal's application, largely on grounds of lack of credibility. In particular, the judge did not believe that Arrazabal had refrained entirely from criminal activity while he was active in MS-13, that he had been framed by U.S. police officers on two separate occasions, that U.S. public defenders had represented him inadequately, that the immigration judge who ordered him removed was racist, that he suffered abuse by Salvadoran police, or that he had received death threats from his fellow gang members.

Addressing Arrazabal's request for withholding of removal, the immigration judge found no credible evidence that upon his return he would be likely to be harmed by MS-13, a rival gang, or the police. The judge observed that Arrazabal had lived in El Salvador for years without suffering serious harm. Moreover, the judge added, even if the evidence supported a finding that he would be harmed upon his return, Arrazabal could not show the necessary link between any such harm and a status protected by the statute (race, religion, nationality, membership in a particular social group, or political opinion, see 8 U.S.C. § 1231(b)(3)(B)). Although former gang members can constitute a "particular social group" for purposes of withholding of removal, see *Benitez-Ramos v. Holder*, 589 F.3d 426, 429 (7th Cir. 2009), and Arrazabal's tattoos made his association quite visible, the immigration judge thought that Arrazabal could not show that his association with MS-13 was severed, because

he had not taken any outward steps to renounce his membership in the gang.

As for Arrazabal's claim for CAT relief, the immigration judge concluded that he had not shown that it was more likely than not that a public official would acquiesce in his torture. Not only, in the judge's view, was Arrazabal's testimony about being harmed in police custody incredible, but also it was not corroborated in any way—not by medical reports, witness statements, or otherwise. The immigration judge's opinion drew no distinction between withholding and deferral of removal for purposes of CAT relief, probably because it appears on the face of the record that Arrazabal is eligible to apply for the withholding remedy.[†]

Faced with these unfavorable rulings, Arrazabal requested a continuance so that he could submit more evidence, including documents showing the level of gang violence in El Salvador and receipts confirming that his mother had sent him money with which to pay off the gang. The immigration judge denied the request as untimely and added that the proposed evidence would not have changed his decision. Arrazabal appealed to the Board of Immigration Appeals, but it upheld the immigration judge's determination as not clearly erroneous.

---

[†] See Executive Office of Immigration Review Fact Sheet, "Asylum and Withholding of Removal, Convention Against Torture Protections" at 8, Jan. 15, 2009, available at https://www.justice.gov/sites/default/files/eoir/legacy/2009/01/23/AsylumWithholdingCATProtections.pdf (last visited March 21, 2016); see also *Wanjiru v. Holder*, 705 F.3d 258, 263–64 (7th Cir. 2013).

In his petition for review Arrazabal first challenges the immigration judge's adverse credibility determination. He maintains that the judge should have accepted his account of his interactions with MS-13 and the police in El Salvador. But our review of an immigration judge's adverse-credibility finding is deferential: we must uphold it so long as it is supported by substantial evidence. See *Tawuo v. Lynch*, 799 F.3d 725, 727 (7th Cir. 2015). The immigration judge's conclusions here meet that standard. Given Arrazabal's implausible claims about police misconduct in the United States, the judge may have thought he had a tendency to embroider. That in turn may have led the judge to require greater corroboration that police misconduct in El Salvador threatened Arrazabal himself. See *Zeqiri v. Mukasey*, 529 F.3d 364, 371 (7th Cir. 2008); *Fedosseeva v. Gonzales*, 492 F.3d 840, 847 (7th Cir. 2007).

Notwithstanding the adverse-credibility finding, Arrazabal next argues, the immigration judge erred in finding that there was "no credible evidence" that he would face a clear probability of persecution if returned to El Salvador. This point has more traction. We agree with Arrazabal that the immigration judge overlooked key evidence. For example, there is no sign that the judge considered an affidavit from Arrazabal's mother-in-law, with whom he had lived in El Salvador. Her testimony corroborated Arrazabal's account of his arrest and beating by the Salvadoran police on account of his perceived gang affiliation, and his statement that MS-13 members threatened to murder him and his family because of his refusal to participate in the gang. The affidavit had been read into the record by Arrazabal's translator during the hearing. At the time the immigration judge said that

he would consider its contents, but he never referred to it in his decision.

This was not a harmless oversight: it led the immigration judge to state, erroneously, that Arrazabal's "claims that he was beaten by the police are not corroborated." The mother-in-law's affidavit may not have been as specific as one would wish, but it did provide at least *some* corroboration for the withholding and CAT claims. The immigration judge also overlooked a letter from Arrazabal's uncle expressing concern that Arrazabal would be murdered by gang members if returned to El Salvador. We express no view about the accuracy of these documents. The problem is that the immigration judge's decision says nothing about them, nor does it grapple with the views of Arrazabal's relatives about the life-threatening danger they believed he would face upon return.

Compounding our concerns about the immigration judge's analysis is his rejection of Arrazabal's contention that there was "no way to get out of the gang." For this important finding, the judge relied exclusively on a feature article that appeared on a news website. The article touted the success of one pilot program in San Salvador that helps former gang members find jobs. But the immigration judge read too much into the article. Its description of one company's decision to hire 30 former gang members does not establish that throughout El Salvador (a country of more than 6 million people), all "those who truly want to leave the gang and who are willing to actually try to leave the gang" (as the immigration judge put it) can do so.

Even more problematic is the immigration judge's determination that even if Arrazabal had been harassed by MS-13 members in El Salvador and could show a clear probability

of persecution if he were to be returned there, he still would not qualify for withholding because he had not shown that his persecution was because of his membership in a particular social group. The immigration judge acknowledged that this court has held that a group comprised of "tattooed, former Salvadoran gang members" would qualify. See *Benitez-Ramos*, 589 F.3d at 428–29. Nevertheless, he said that Arrazabal's failure to take outward steps to renounce gang membership (meaning, perhaps, his failure to undergo the painful and expensive process of tattoo removal) automatically meant that he was an *active* rather than a *former* gang member and thus not a member of the latter social group. He may want to leave the gang, the immigration judge said, but "[g]ang members who have subjectively decided to leave are not socially distinct because only they know individually their own thoughts."

But the record shows that Arrazabal was not asking anyone to read his mind, and so the immigration judge was wrong to suggest that renunciation of membership required Arrazabal to take more visible steps to distance himself from the gang. Arrazabal testified that he did take objectively ascertainable steps: he repeatedly rebuffed the efforts of MS-13 members to recruit him to commit crimes and regularly paid extortion money to avoid harm. If we accept that testimony as true (as the immigration judge implicitly did in this portion of his analysis), there is little more Arrazabal could have done to distance himself from the gang without putting himself at even more risk of reprisal.

We are also concerned about the manner in which the immigration judge rejected Arrazabal's claim for CAT relief. The judge acknowledged that it was possible that Arrazabal

would be tortured in El Salvador with at least the acquiescence of the police, yet he concluded without elaboration that Arrazabal had not met his burden of showing that result was "more likely than not." See 8 C.F.R. § 1208.16(c)(2–3). But that oft-repeated phrase must be understood pragmatically in the immigration context, because there is no reliable data to show just how great an applicant's risk of torture is. See, *e.g.*, *Gutierrez-Rostran v. Lynch*, 810 F.3d 497, 501 (7th Cir. 2016); *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1135–36 (7th Cir. 2015); *Yi–Tu Lian v. Ashcroft*, 379 F.3d 457, 461 (7th Cir. 2004). "All that can be said responsibly on the basis of actually obtainable information is that there is, or is not, a substantial risk that a given alien will be tortured if removed from the United States." *Rodriguez-Molinero*, 808 F.3d at 1135–36.

Given these problems, Arrazabal's case must be remanded to the Board for further proceedings. Because this is so, we need not address the question whether the immigration judge abused his discretion in denying Arrazabal's request for a continuance. Accordingly, we GRANT the petition for review, VACATE the order of removal, and REMAND for further proceedings consistent with this opinion.