In the

# United States Court of Appeals
## For the Seventh Circuit

No. 17-2969

FRANCISCO ALBERTO ROMERO
ARRAZABAL,

*Petitioner*,

*v.*

WILLIAM P. BARR, Attorney General
of the United States,[*]

*Respondent.*

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A045-091-341

ARGUED APRIL 3, 2019 — DECIDED JULY 3, 2019

Before WOOD, *Chief Judge,* and BAUER and ROVNER, *Circuit
Judges*.

---

[*] We substitute William P. Barr, the current Attorney General of the United
States, as the Respondent in this action. *See* Fed. R. App. P. 43(c)(2).

ROVNER, *Circuit Judge.* This matter is before this court for a second time on Francisco Arrazabal's pending requests for withholding of removal and protection under the Convention Against Torture ("CAT"). Arrazabal contends that he faces the likelihood of continued persecution and torture in his native El Salvador as someone who has renounced his membership in the notorious Mara Salvatrucha gang, more commonly known as MS-13. Two years ago, we remanded the matter to the Board of Immigration Appeals (the "Board" or "BIA") for further proceedings after concluding that both the Immigration Judge ("IJ") and the Board, in rejecting Arrazabal's claims, had overlooked certain evidence that on its face corroborated Arrazabal's account. *Arrazabal v. Lynch*, 822 F.3d 961 (7th Cir. 2016). The case returns to us now following a second hearing before an IJ, to whom additional evidence was presented, and another round of review before the Board, which again resulted in the denial of Arrazabal's requests for relief. Because the IJ and the Board mischaracterized certain evidence and yet again ignored the corroborative aspects of the evidence, we conclude that we must remand for further proceedings for a second time.

## I.

Arrazabal was born in El Salvador and admitted to this country as a lawful permanent resident in 1995, at the age of 19. His mother and sister live in the United States and are now American citizens. After disagreements caused his mother to evict him from her Los Angeles home in 1996, he became homeless. Shortly thereafter, he was recruited into the MS-13

gang (which he says offered him shelter and food),[1] had a number of run-ins with the law, and was eventually convicted on firearms and drug charges. While incarcerated, he had himself tattooed on his chest, fingers, arms, head, and back to signal his affiliation with MS-13. His criminal record resulted in a revocation of his status as a lawful permanent resident of this country. His subsequent request for asylum was denied, and he was ordered removed to El Salvador in 2001.

Arrazabal alleges that he renounced his gang membership upon his return to El Salvador, repeatedly rebuffed the efforts of local MS-13 gang members to involve him in gang activities, and as a result suffered violence at the hands of MS-13 (which opposes his efforts to leave it), a rival gang (who think he is active in MS-13), and the police (who likewise believe he is still an active gang member). He represents that he was arrested without cause on roughly 30 occasions and was jailed for extended periods in 2008 and 2010 pursuant to arrests for suspected involvement with gang extortion. While interrogating him pursuant to the latter two arrests, police officers allegedly struck him with their hands and batons and burned him with cigarettes; he also avers that he was beaten by gang members during his subsequent incarceration. In both instances, he was eventually released from custody after his mother made payments to two different lawyers—$5,000 on the first occasion, and $2,500 on the second. (Although the details of his release are unclear, there are suggestions in the

---

[1] There are some conflicting statements from Arrazabal in the record suggesting that he may have joined MS-13 when he was 14 years old and still living in El Salvador.

record and the briefing that the money was used to bribe the authorities.) When he was not in jail, Arrazabal used funds sent by his mother every month to pay MS-13 $10 a week in order to be left alone. The payments of "rent" worked for a time, but eventually the threats, harassment, and beatings by gang members resumed (and according to Arrazabal's mother, there came a time when she no longer was able to send him money for this purpose when she became ill). He was pistol-whipped on one occasion; rocks with threatening messages were thrown through the windows of his mother-in-law's home, where he was living; and on one occasion in 2012, masked intruders entered the home, threatened his mother-in-law, and struck her in the chest with a gun.

Eventually, Arrazabal fled El Salvador and returned to the U.S. illegally. He was arrested in 2012 for unlawful reentry and spent 27 months in federal prison. He applied again for asylum, and in 2014, an asylum officer preliminarily determined that he had a reasonable fear of being tortured if returned to El Salvador. Because Arrazabal's 2001 removal order disqualified him from seeking asylum, he instead sought withholding of removal and CAT protection, alleging based on his past experiences that he was likely, if returned to El Salvador, to face persecution as a member of a social group comprising former MS-13 gang members. An IJ conducted a hearing on those claims, at which Arrazabal appeared *pro se* and testified in his own behalf; but upon consideration of the evidence Arrazabal presented, the IJ denied him relief. The IJ found, *inter alia*, that Arrazabal's testimony regarding his experiences in El Salvador was not credible to the extent it was uncorroborated by other evidence (A.R. 1078–79, 1080, 1081);

that he did not qualify as a member of a particular social group because he had not adequately proved that he was, in fact, a former rather than a current gang member (A.R. 1080); that he had not taken sufficient outward steps (including, for example, the removal of his tattoos) to disassociate himself from the gang (A.R. 1080); and that, because he had not presented credible evidence in support of his allegations of past persecution, he had not shown that he would face persecution or torture if returned to El Salvador (A.R. 1080, 1081–82). The BIA dismissed his appeal, concluding that "[i]n the absence of credible testimony, [Arrazabal] did not establish his eligibility for withholding of removal under the Act, as the documentary evidence he submitted did not independently and credibly establish his claim of persecution on account of a protected ground enumerated in the Act in El Salvador," and that his claim for CAT protection likewise failed for want of sufficient proof. A.R. 766.

This court granted review and returned the case to the Board. We declined Arrazabal's invitation to overturn the IJ's determination that he was not a credible witness, reasoning that it was supported by substantial evidence. 822 F.3d at 964–65. Nonetheless, we identified certain problems with the IJ's decision that warranted a remand. We noted first that the IJ, in stating that Arrazabal's account of his travails in El Salvador was not corroborated, had overlooked key evidence, including an affidavit from Arrazabal's former mother-in-law (with whom he had lived in El Salvador), who corroborated Arrazabal's account of being arrested and beaten by police on account of his perceived gang affiliation, and the threats on his life from MS-13. 822 F.3d at 965. Likewise, the IJ had not

mentioned a letter from Arrazabal's uncle expressing concern that Arrazabal would be murdered by gang members if returned to El Salvador. *Id.* We went on to criticize the IJ's analysis as to whether Arrazabal qualified as a member of a particular social group for purposes of withholding of removal. As the IJ himself had acknowledged, we had previously held that a tattooed former gang member could qualify as a member of a particular social group. *Id.* at 965 (citing *Benitez Ramos v. Holder*, 589 F.3d 426, 428–29 (7th Cir. 2009)). The IJ had nonetheless faulted Arrazabal for not having taken sufficient overt measures to disassociate himself from MS-13 and for instead invoking his own subjective intent to distance himself from the gang. But this was not an accurate recounting of Arrazabal's evidence on this point. Arrazabal had testified that he had repeatedly rebuffed the gang's efforts to involve him in its criminal activities and had made regular extortion payments to avoid harm by the gang. *Id.* at 966. "If we accept that testimony as true (as the immigration judge implicitly did in this portion of his analysis), there is little more that Arrazabal could have done to distance himself from the gang without putting himself at even more risk of reprisal." *Id.* Third, the court expressed concern about how the IJ had handled the CAT claim. The IJ had acknowledged the possibility that Arrazabal might be tortured by MS-13 with the acquiescence of the police, yet had nonetheless denied his claim on the ground that he had not shown such torture was "more likely than not" to occur. "But that oft-repeated phrase must be understood pragmatically in the immigration context, because there is no reliable data to show just how great an applicant's risk of torture is." *Id.* (collecting cases). "All that can be said

responsibly on the basis of actually obtainable information is that there is, or is not, a substantial risk that a given alien will be tortured if removed from the United States." *Id.* (quoting *Rodriguez-Molinero v. Lynch*, 808 F.3d 1134, 1135–36 (7th Cir. 2015)).

When the case returned to the Board, the Board, at the government's request, remanded the matter to a different IJ in order to conduct another hearing on Arrazabal's claims. Arrazabal again represented himself. He submitted a new statement to the court in advance of the hearing but did not testify. Arrazabal's mother, Anna, and his sister, Karen, both testified at the hearing. Because they live in the United States, their testimony regarding events and conditions in El Salvador was, to a significant degree, based on their conversations with persons still living in that country, including Arrazabal's former (common-law) wife and mother-in-law. Based on such second-hand information, for example, Karen generally corroborated the state of affairs with gangs and police in El Salvador and represented that MS-13 had threatened Arrazabal. Anna, likewise relying on information supplied by her son and his former wife and mother-in-law, described the situation confronting her son in El Salvador, including the 2012 incident in which gang members had come to his (former mother-in-law's) home looking for him; she also confirmed that he had been arrested and incarcerated twice, and was beaten by gang members during his 2010 incarceration. In addition, Anna testified, *inter alia*, that she had sent her son $70 per month in support, from which he took $10 per week to pay MS-13 in order to be left alone. Arrazabal also submitted three sworn letters from family members and acquaintances in El

Salvador corroborating the threats, beatings, and arrests. He also submitted news articles and other materials about the general situation in El Salvador.

After considering the record as supplemented by this new evidence, the IJ again denied Arrazabal's claims for relief. The judge in the first instance declined to revisit her predecessor's finding that the testimony of Arrazabal himself at the first hearing was not credible. A.R. 100. Accordingly, she focused on whether the other evidence Arrazabal presented corroborated his allegations that he had been persecuted on account of his status as a former member of the MS-13 gang.

The IJ accorded the two pieces of evidence this court said were overlooked in the first decision—the letters from his former mother-in-law and his uncle—"little evidentiary weight." A.R. 101. Although the letter from Arrazabal's former mother-in-law indicated that Arrazabal had been beaten at the hands of the police, "it does not describe any specific instances of harm, comment on the frequency of the beatings, or state if she witnessed any beatings." A.R. 101. The letter also did not say anything about the two arrests that led to Arrazabal's incarceration, was "vague" as to any threats made by MS-13, and said nothing about the alleged incident in 2012 when gang members had broken into her home looking for Arrazabal and struck her with a gun. A.R. 101–02. Finally, given that Arrazabal's mother and sister had said they were in regular contact with his former mother-in-law, it was not clear to the judge why she had not provided the court with a more current and specific account. A.R. 102. As for the letter from Arrazabal's uncle, that letter (like the former mother-in-law's letter) was now more than two years old, was unsworn, did

not disclose whether the uncle was living in the United States or El Salvador, and while stating generally that the gang was looking for Arrazabal, provided neither details nor the basis for the uncle's knowledge in this respect. A.R. 102.

The IJ also concluded that the additional evidence submitted in the second hearing did not sufficiently corroborate Arrazabal's story. As a general matter, the testimonies of Arrazabal's mother and sister had limited value to the extent they were based on second-hand information provided to them by Arrazabal's former wife and mother-in-law. A.R. 103. The IJ also viewed Anna's testimony as inconsistent with her son's account to the extent she gave different dates than he had for the two arrests that resulted in lengthy periods of incarceration; and she had testified to only giving him $70 a month, not the $7,500 Arrazabal had said was used to procure his release from jail. A.R. 104. Moreover, the IJ understood Anna to have testified that Arrazabal was in no way unique in having to pay extortion or "rent" money to MS-13: "In fact, Anna said everyone in El Salvador has to pay rent to avoid harm." A.R. 104. Karen, for her part, had spoken to only one specific threat her brother had received (when a rock was thrown through the window of his former mother-in-law's house), but again, she lacked personal knowledge of this incident. A.R. 104.

Finally, as relevant here, the IJ discounted the value of the three new letters Arrazabal had submitted from persons living in El Salvador. She noted that the letters "use nearly identical phrases, sentence composition, and formatting to each other which gives these letters indicia of unreliability." A.R. 103. The letters had all been translated from Spanish to English by Arrazabal's sister, which the judge noted might account for

some of the similarities. The judge also acknowledged that one of the letters contained a detail regarding an assault on Arrazabal that was missing from the other letters. But the IJ noted that all three letters were similar to the letter from Arrazabal's former mother-in-law which this court had singled out in its decision, and apparently deemed them to be of little weight for the same reasons. A.R. 103.

The IJ summed up as follows:

> Because the letters are unreliable and vague, because the applicant did not provide current corroborative evidence that was reasonably obtainable, and because the remand testimony does not corroborate the applicant's claims, the Court finds the applicant has not provided sufficient corroboration to carry his burden of proof under the REAL ID Act. Further, because the same incredible and insufficiently corroborated testimony forms the basis of the applicant's request for protection under CAT, the Court also denies the applicant's request for protection under CAT.

A.R. 105. The BIA affirmed the IJ's decision in an order tracking and adopting the IJ's rationale in all material respects. A.R. 2–5.

Arrazabal again appealed to this court. We denied his motion for a stay of removal pending a resolution of the appeal, and Arrazabal was again removed to El Salvador in

February 2018, shortly after the initial merits briefs were filed.[2] After reviewing Arrazabal's *pro se* brief, the Attorney General's brief, and the appellate record, we appointed counsel to represent Arrazabal and had the case re-briefed and argued.

## II.

To succeed on his claim for withholding of removal, Arrazabal must establish a clear probability that his life or freedom will be threatened in El Salvador due to his membership in a particular social group. 8 U.S.C. § 1231(b)(3)(A); *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 826–27 (7th Cir. 2016). As we noted in our prior decision, a tattooed, former Salvadoran gang member can qualify as a member of a particular social group for this purpose. 822 F.3d at 965 (citing *Benitez Ramos*, 589 F.3d at 428–29). One way for an individual to establish that his membership in a given social group is likely to result in a threat to his life or freedom is to show that he has experienced persecution in the past owing to that very status. 8 C.F.R. § 1208.16(b)(1); *Ishitiaq v. Holder*, 578 F.3d 712, 717 (7th Cir. 2009). We have described persecution as "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Toptchev v. I.N.S.*, 295 F.3d 714, 720 (7th Cir. 2002) (quoting *Begzatowski v. I.N.S.*, 278 F.3d 665, 669 (7th Cir. 2002)). Persecution entails more than simple harassment but includes such actions as "detention, arrest, interrogation, prosecution, imprisonment, illegal searches, confiscation of property, surveillance, beatings,

---

[2] His removal, of course, does not render moot his challenge to the removal order. *Singh v. Holder*, 720 F.3d 635, 638 (7th Cir. 2013) (citing *Hor v. Gonzales*, 421 F.3d 497, 498 (7th Cir. 2005)).

or torture." *Id.* (cleaned up); *see also Bolante v. Mukasey*, 539 F.3d 790, 794 (7th Cir. 2008) (persecution also includes behavior that threatens death, imprisonment, or the infliction of substantial harm or suffering). Evidence that one's status as a former gang member will more likely than not result in a threat to his life or freedom will suffice to establish the "clear probability" that withholding of removal requires. *Lozano-Zuniga*, 832 F.3d at 827 (citing *Musa v. Lynch*, 813 F.3d 1019, 1023 (7th Cir. 2016)).

In order to claim protection under the CAT, Arrazabal must prove that it is more likely than not that he will be subject to torture as a result of his removal to El Salvador. *Lozano-Zuniga*, 832 F.3d at 830. Torture is defined as the intentional infliction of severe pain or suffering (physical or mental) for purposes of intimidation, coercion, punishment, or discrimination, which takes place at the instigation or with the acquiescence of a public official. *See* 8 C.F.R. §§ 208.18(a)(1), 1208.18(a); *Fuller v. Whitaker*, 914 F.3d 514, 516 n.3 (7th Cir. 2019); *Lozano-Zuniga*, 832 F.3d at 830. Proof of "a substantial risk that a given alien will be tortured if removed from the United States" will suffice to satisfy the more-likely-than-not standard. *Arrazabal*, 822 F.3d at 966 (quoting *Rodriguez-Molinero v. Lynch, supra*, 808 F.3d at 1135–36). An alien need not establish that the torture is due to his membership in a particular social group in order to claim the protections of the CAT. *See Rapheal v. Mukasey*, 533 F.3d 521, 525 (7th Cir. 2008) (quoting *Pavlyk v. Gonzales*, 469 F.3d 1082, 1090 (7th Cir. 2006)).

Arrazabal has alleged that although he once was a member of the MS-13 gang, he is no longer affiliated with that gang; that he has rebuffed the gang's overtures to him in El Salvador;

that he has been watched, harassed, threatened, and subjected to physical violence by gang members as a result; that a rival gang has attacked him believing that he is still active with MS-13; that the police likewise regard him as a member of MS-13 and have arrested, beaten, and jailed him without cause on that basis; and that the jailings have in turn exposed him to more violence at the hands of gang members (in which the authorities have acquiesced). If Arrazabal's account is true, then he has presented plausible claims for withholding of removal and protection under the CAT.

But of course, the first IJ to hear Arrazabal's case found that his testimony was not credible (a finding we determined was supported by substantial evidence), and the second IJ declined to disturb that assessment. The adverse credibility finding does not by itself doom Arrazabal's claims, but it does render corroboration from other witnesses and documents essential to the success of his case. *See Xiang v. Lynch*, 845 F.3d 306, 309 (7th Cir. 2017) (citing *Lin v. Ashcroft*, 385 F.3d 748, 751 (7th Cir. 2004)). Only by presenting evidence that persuasively corroborates the material aspects of his testimony can Arrazabal hope to prevail on his claims.

That is why in the prior appeal we remanded this case to the Board: the IJ and the Board had both overlooked certain evidence which on its face supported Arrazabal's account as to what has happened to him and what is likely to happen if he remains in El Salvador. On remand, the IJ and the Board found the two pieces of evidence we had highlighted in our decision insufficient to meaningfully corroborate Arrazabal's account. They were within their rights to do so: they considered the evidence and articulated logical reasons to discount the

corroborative value of the letters submitted by Arrazabal's uncle and former mother-in-law. But in recounting and evaluating the additional evidence Arrazabal presented at the second hearing, the IJ and the Board committed the very same sorts of errors that led to our prior decision to remand the case. As Arrazabal points out, the IJ, seconded by the Board, overlooked certain significant corroborative aspects of the evidence he presented.

We are satisfied that Arrazabal did not waive these points, as the government contends that he did. Arrazabal, of course, was *pro se* before both the IJ and the Board. His brief to the Board reflects many of the problems that typify *pro se* pleadings: poor writing, lack of focus, repetition, a reliance on narrative without citation to the record, distraction with irrelevant matters, and so on. The brief nonetheless does argue that the IJ made mistakes, that she overlooked evidence corroborating his account, and that her decision on the whole was not supported by substantial evidence. A.R. 64, 66, 68, 69, 74, 75. (A "motion to reconsider evidence" filed the same day as his brief to the Board makes essentially the same points. A.R. 6–8.) Collectively, these assertions amount to the semblance of an argument that the IJ did not fully and fairly consider the corroborative aspects of the evidence Arrazabal presented and placed the BIA on notice of the need to examine that evidence. *See Hamdan v. Mukasey*, 528 F.3d 986, 990–91 (7th Cir. 2008). Our own decision remanding the matter to the Board had made clear that it was the Board's duty to examine carefully each piece of evidence that Arrazabal had submitted to assess its corroborative value; that decision itself established an agenda for the Board in addition to the particular points

Arrazabal attempted to make in his (second) appeal to the Board. Indeed, the Board's order, to the extent it recounted each of the points the IJ had made in rejecting Arrazabal's claims and endorsed the IJ's findings, indicates that the Board had undertaken a comprehensive review of the record in response to Arrazabal's appeal. Under these circumstances, we do not agree that Arrazabal's failure to point out specific discrepancies between the evidence and the IJ's summary and characterization of the evidence resulted in a waiver of the right to raise those discrepancies here. The Board plainly understood that our prior decision charged it with the obliga-tion to examine Arrazabal's evidence conscientiously and to consider the extent which it did or did not corroborate his factual account. Having reviewed, recounted, and endorsed the IJ's rationale in all material respects, any errors made by the IJ in recounting and assessing the degree of corroboration the evidence lent to Arrazabal's allegations are fair game here.

Having now reviewed the record as supplemented by the second hearing before the IJ, we find that there are several respects in which the documents and testimony presented to the IJ corroborated certain material aspects of Arrazabal's story, and yet the IJ and the Board failed to recognize those corroborative aspects.

This is particularly the case with the testimony provided by Arrazabal's mother, Anna. Anna was an important witness because, by her account as well as that of her son, it was she who provided a total of $7,500 for him to get out of jail in El Salvador on two occasions and who also sent him $70 each month, which he used in part to make the $10 weekly extortion payments to MS-13. Anna obviously had personal knowledge

of these payments and thus was able to corroborate
Arrazabal's story in these respects. In the original round of
proceedings before the first IJ, Anna submitted a letter dated
August 19, 2014 to the court in lieu of testifying (A.R. 768)[3]; in
the proceedings conducted on remand before the second IJ, she
submitted a second letter dated August 22, 2016 (A.R. 541), and
she also gave testimony over the course of two days, the first
in person and the second by video. The second IJ's decision
understandably focused on Anna's in-court testimony. As we
have noted, the IJ discounted that testimony insofar as it
concerned the conditions in El Salvador and what had hap-
pened to her son there because it was based not on her per-
sonal knowledge but rather what she had been told by others,
including Arrazabal's former mother-in-law. That is a fair
point, subject to the qualifications we note below. But there
were certain matters as to which Anna had personal knowl-
edge, including the money she had sent to (or on behalf of) her
son and for what purposes. And as to these matters, the IJ
failed to take into account her new letter, dated August 22,
2016, which was in the record.

For example, the IJ stated that Anna's testimony failed to
corroborate her son's averment that she had made payments
of $2,500 and $5,000 to lawyers in order to secure his release
from prison. A.R. 104. It is true enough that Anna did not
testify about this point: she was never asked. (Arrazabal asked
only two questions of his mother; the bulk of the questioning

---

[3]  In the first round, she also submitted another letter to the court dated
June 17, 2014, but that letter simply urged that her son be released from
custody pending a hearing on the merits of his case. A.R. 1210.

was undertaken by the judge and the government's counsel.) She did, in response to questioning by the government, state that she had submitted multiple letters to the court on her son's behalf. A.R. 211–12. But no one questioned her about the contents of those letters. Anna's letter dated August 22, 2016 (prior to the second hearing) specifically corroborated Arrazabal's representations that he (or rather, his mother) was forced to pay a total of $7,500 to two lawyers in order to get out of jail: the letter represents that she sent payments of $5,000 and $2,500 to the two lawyers (whom she identifies by name), and obviously this was a fact that was within her personal knowledge. A.R. 541. This is an important point of corroboration, both as to the fact of Arrazabal's imprisonment and how he managed to obtain his release. Recall that some of the physical abuse Arrazabal alleges he experienced at the hands of gang members and Salvadoran police took place when he was arrested, interrogated, and then incarcerated on these two occasions, so the fact and circumstances of his arrests and incarceration were material to his claims. Not only did the IJ and the government fail to ask her about the letter—as the IJ acknowledged (A.R. 104 n.6)—but the letter was never addressed in the IJ's decision. It was the IJ's apparent failure to review her letter that led her to state that Anna's testimony did not sufficiently corroborate her son as to the payments to the lawyers. A.R. 104.

The IJ, of course, was not compelled to credit Anna's letter or to deem its corroboration (if credited) sufficient, alone or together with the other evidence, to carry the day on the merits of Arrazabal's claims for relief. But the IJ was required to recognize the corroborative aspects of Anna's letter as well as

her testimony to the court and to take that corroboration into account in assessing the weight of the evidence. The judge's failure to do so was a material omission.

Moreover, although Anna's testimony did conflict in part with Arrazabal's own account as to the dates of his incarceration in El Salvador, as the IJ pointed out (A.R. 104), it also corroborated his testimony in part. Arrazabal represented that he had been imprisoned in 2008 and 2010. The IJ understood his mother to have testified he was imprisoned in 2011 and 2012. A.R. 96, 104. In fact, Anna, who was questioned repeatedly on the dates her son was in jail, said he was incarcerated in both 2010 and 2011. A.R. 204, 205, 206, 235, 236, 237, 245. Her dates obviously do not correspond perfectly with Arrazabal's dates, but they do corroborate his testimony that he was jailed for a period of time in 2010. (And, again, given that she was sending money to her son to help him get out of jail, she would have reason to know when he was incarcerated.) Moreover, it was during the 2010 incarceration, which Anna believed to have been the first of his two incarcerations, that Anna recalled her son losing a molar and suffering an oral infection as a result of a beating by gang members. A.R. 237–38, 239. This corresponds with her son's statement that he suffered a cracked molar as a result of a jailhouse beating during his first incarceration. A.R. 705. The judge did not acknowledge these corroborating consistencies in their accounts, and this was a significant oversight.

Nor, finally, did Anna's testimony equate the danger that her son faced as a former gang member with the dangers encountered by the general citizenry in El Salvador, as the IJ believed. A.R. 96–97, 104. *See Lozano-Zuniga v. Lynch, supra,* 832

F.3d at 828–29 (fears of generalized harms in alien's home country insufficient to support relief) (collecting cases). In examining Anna, both the IJ and the government's counsel attempted to elicit from her a concession that any citizen, not just a former gang member, might find himself forced to pay "rent" to MS-13 in order to avoid harassment. A.R. 207–08, 242–43. To place her answers in full context and to show why we think the IJ mischaracterized those answers, we recount the relevant portions of her testimony here. The following colloquy took place between the IJ and Anna, who testified through an interpreter:

> JUDGE: Now, do people who are not gang members have to pay extortion money for protections?
>
> ANNA: Yeah. Yes. The people who have businesses, they have to pay the rent to gang members.
>
> JUDGE: So, your son basically had to pay the same extortion money other people had to pay. Is that correct?
>
> ANNA: Yes. He had to pay so he wouldn't be harmed or they wouldn't harm his children.

A.R. 207–08. And here is the follow-up questioning on this point by the government's counsel:

> COUNSEL: And you—I believe you told the judge—because I wrote this down—you said your son is like everyone else. He had to pay like everyone else to avoid being harmed or having his kids harmed. Is that what you said, ma'am?

> ANNA: Yes. In fact, I did pay this amount because I did not want them to harass him anymore, because he already has a family. He already has children. And with him dead, who's going to take care of the children?

> COUNSEL: So, basically, your son is not unique when he was in El Salvador, paying off the gangs or paying off the police. Everyone else there is paying rent to somebody to live safely. Correct?

> ANNA: Well, as a matter of fact, they would pressure more the people who own businesses. But in his case, he did not want to join the gang, and that is why, you know, he was paying the rent. …

A.R. 242–43. Looking carefully at Anna's testimony, the most that she acknowledged was that some business owners might be forced to pay money to the gang just as her son had. A.R. 208, 243. When the IJ asked her if there were people other than (former) gang members who had to pay rent to the gang, Anna acknowledged that some business owners had to make extortion payments; she did not affirm that *any* other citizen might have to make such payments. When the government's counsel later suggested that Anna had told the judge that "everyone else" had to pay rent to the gang and asked her if that was correct, Anna in response said "yes" and immediately explained that it was necessary for *her son* to pay extortion money in order to avoid harassment. A.R. 243. When counsel followed up to again ask if her son was like "everyone else" in that respect, she told counsel, as she had the judge, that it was business owners who likewise were forced to pay off the gang.

A.R. 243. Only by focusing on her initial "yes" to counsel and ignoring what followed (and what she had told the judge earlier) could one read into her testimony a sweeping concession that her son's plight vis-à-vis the gang was no different from that of anyone else in El Salvador. And that is not a fair reading of her testimony. By reading into her testimony a broad concession that any El Salvadoran might be forced to pay monetary tribute to the gang, the IJ was able to downplay the unique nature of the danger that Arrazabal alleges he has faced due to his status as a former gang member. The balance of Anna's testimony is consistent with Arrazabal's position that it is his membership in a particular social group—former MS-13 gang member—that accounts for the harassment, threats, beatings, and incarceration he has experienced. Anna repeatedly emphasized that Arrazabal was forced to pay weekly rent to MS-13 because of his status as a former gang member. A.R. 207, 243. Thus, contrary to the IJ's construction of her testimony, Anna did corroborate that her son faces a particular risk of harm. Again, this was a serious error on the IJ's part.

More broadly, the IJ also discounted much of Anna's testimony as constituting or deriving from hearsay. Because she lives in the United States, it is true that in certain respects her testimony was based upon what she has been told by Arrazabal and his former wife and mother-in-law. On the other hand, the substantial sums of money she sent Arrazabal to help him get out of jail and to pay MS-13 protection money to avoid harm when he was out of jail are, as indicated above, within her personal knowledge. Moreover, her testimony still corroborates Arrazabal's account to the extent it is consistent with his own version of events and that of other witnesses. Hearsay is,

after all, admissible in immigration proceedings so long as it is reliable. *Vidinski v. Lynch*, 840 F.3d 912, 917 (7th Cir. 2016); *Malave v. Holder*, 610 F.3d 483, 487 (7th Cir. 2010); *Duad v. United States*, 556 F.3d 592, 596 (7th Cir. 2009). Certainly her testimony may be entitled to reduced weight to the extent it derives from what she has been told rather than what she has personally witnessed, but her testimony cannot be dismissed altogether on this basis.

The IJ signaled that she was disinclined to give significant weight to what corroboration there was to be found in the letters, affidavits, and testimony from Arrazabal's relatives and friends because this evidence was supplied by "interested parties." A.R. 101 (discounting the letters from Arrazabal's former mother-in-law and uncle on this basis). It is true that they are interested, but this will also be true in many asylum and CAT cases, as it is the petitioner's friends and relatives who are most likely to know what the petitioner has experienced. A particular witness may or may not be credible, and his or her relationship with the petitioner certainly factors into that determination, but to summarily discredit his testimony solely because he or she has a connection with the petitioner would not be appropriate. *Cf. Payne v. Pauley*, 337 F.3d 767, 771–73 (7th Cir. 2003) (noting that although most affidavits submitted in litigation typically are self-serving, their self-serving character alone does not mean they can be disregarded in determining whether a party's version of the facts has any evidentiary support).

We note, finally, that there is one additional piece of evidence—specifically, a sworn letter submitted by Dinora Elizabeth Franco—related by marriage to Arrazabal's former

mother-in-law—that likewise corroborates certain aspects of Arrazabal's story. Franco's statement was one of three sworn statements that the IJ discounted because they were all similarly worded. A.R. 103. It is true that the bulk of these statements contain a great deal of identical language, and we do not fault the IJ for taking that similarity into consideration in assessing the weight to be accorded that evidence. What the IJ at first acknowledged but then proceeded to ignore, however, is a passage in Franco's statement that was unique to her statement and which described an incident in which Arrazabal was pistol-whipped by gang members and in which she treated his injuries so that he did not have to travel to a hospital for that purpose and risk further harassment by the gang while en route. A.R. 298. Again, taken at face value, this short passage on its face corroborates an important piece of Arrazabal's story—being physically attacked by MS-13 gang members—and Franco's statement is, in contrast to others, both specific and based on her personal knowledge. Again, the IJ and the Board are not compelled to accept Franco's statement as true or to give it any particular weight. In contrast with other witnesses, Franco is not related to Arrazabal, although she evidently is a family friend. But the IJ and the BIA must at a minimum acknowledge the corroboration her statement contains and consider it accordingly.

These sorts of oversights and mistakes in the analysis of the IJ and the Board convince us that a second remand is necessary. To be clear, it is for the IJ and the Board to weigh the evidence and to decide whether Arrazabal has met his burden with respect to withholding of removal and relief under the CAT. For that reason, we reject Arrazabal's suggestion that we

may simply reverse the Board and remand with directions to grant him relief. But the IJ and the Board must in the first instance take fair notice of the corroboration found in the evidence Arrazabal has submitted and take that corroboration into account in evaluating his claims. And they must not only take each piece of evidence in isolation, but they must consider the sum total of the evidence in deciding whether Arrazabal has met his burden. *See Hanaj v. Gonzales*, 446 F.3d 694, 700 (7th Cir. 2006).

### III.

For the reasons set forth in this opinion, we GRANT Arrazabal's petition for review and REMAND this matter to the BIA for further proceedings consistent with this opinion. We thank appointed counsel for their vigorous advocacy on Arrazabal's behalf.